Paul Tanck
Greg Carbo
Neal McLaughlin
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel: (212) 210-9400 / Fax: (212) 210-9444

Sam Bragg
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Tel: 214-922-3400 / Fax: 214-922-3899

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LABORATORIOS PISA S.A. de C.V; AND CAB ENTERPRISES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> PEPSICO, Inc.; AND STOKELY-VAN CAMP, INC., <br><br> Defendants. | Civ. Action No.: 7:21-CV-0062 <br><br><br> **(JURY DEMAND)** |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' EMERGENCY MOTIONS FOR TEMPORARY RESTRAINING ORDER
## AND ORDER TO SHOW CAUSE FOR
## <u>A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 6

III.  ARGUMENT .................................................................................................... 33

  A.    Plaintiffs Have a Strong Likelihood of Success on the Merits on Their Trade .. 34

  Dress Infringement, Trademark Infringement, and False Designation of Origin Claims

  ................................................................................................................................. 34

      1.    The ELECTROLIT Trade Dress Qualifies for Protection.............................. 36

      2.    There Is a Likelihood of Confusion Between ELECTROLIT and Gatorlyte

  Products.    39

  B.    Plaintiffs Have a Strong Likelihood of Success on Their Dilution Claims ........ 47

  C.    Plaintiffs Are Suffering Irreparable Harm as a Result of the PepsiCo's Activities

      48

  D.    The Balance of the Equities Is in Plaintiffs' Favor. ............................................ 50

  E.    Injunctive Relief Is in the Public Interest............................................................ 51

IV.   CONCLUSION .................................................................................................. 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Academy Ltd. v. CWGS Grp., LLC*,
    2019 U.S. Dist. LEXIS 189507 (S.D. Tex. Oct. 31, 2019)....................................................39

*Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*,
    532 F. Supp. 1376 (S.D. Tex. 1982), *aff'd by* 701 F.2d 408 (5th Cir. 1983)....................43, 51

*Amazing Spaces, Inc. v. Metro Mini Storage*,
    608 F.3d (5th Cir. 2010) ..................................................................................................38

*Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) .......................................................................................43, 46

*Blue Bell Creameries, L.P. v. Denali Co., LLC*,
    2008 U.S. Dist. LEXIS 58083 (S.D. Tex. July 31, 2008)....................................................43

*Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*,
    510 F.2d 1004 (CA. Tex. 1975)....................................................................................36, 49

*Carillon Importers Ltd. v. Frank Pesce Group, Inc.*,
    913 F.Supp. 1559 ...............................................................................................................37

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1987) ...........................................................................................44

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*,
    659 F.2d 695 (5th Cir. 1981) ......................................................................................37, 38

*Clearline Techs., Ltd. v. Cooper B-Line*,
    No. H-11-1420, 2012 U.S. Dist. LEXIS 2116 (S.D. Tex. Jan. 9, 2012)...............................35

*Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*,
    719 F.Supp. 725 (N.D. Ill. 1989) .......................................................................................37

*Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*,
    843 F.2d 600 (1st Cir. 1988)...............................................................................................50

*Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*,
    616 F.Supp. 2d 622 (N.D. Tex. 2009) ..............................................................37, 40, 41, 42

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
    710 F.3d 579 (5th Cir. 2013) ......................................................................................34, 35

*Elvis Presley Enters. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ............................................................42

*Home Box Office, Inc. v Showtime/Movie Channel, Inc.*,
   832 F.2d 1311 (2d Cir. 1987)............................................................49

*Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*,
   333 S.W.3d 719 (Tex. App. 2010)......................................................36

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ............................................................35

*Joy Mfg. Co. v. CGM Valve & Gauge Co.*,
   730 F.Supp. 1387 (S.D. Tex. 1989) ..............................................36, 48

*KFC Corp. v Goldey*,
   714 F. Supp. 264 (W.D. Ky. 1989)................................................36, 48

*Lady Primrose's, Inc. v. After Hours Bath Prods.*,
   2000 U.S. App. LEXIS 40947 (5th Cir. Mar. 6, 2000) (unpublished) ............37, 43

*Lakedreams v. Taylor*,
   932 F.2d 1103 (5th Cir. 1991) ......................................................50, 51

*Levi Strauss & Bo. v. Blue Bell, Inc.*,
   1978 U.S. Dist. LEXIS 16577 (N.D. Cal. July 14, 1978)......................47

*Magic Valley Concrete, LLC v. Union Pac. R.R. Co.*,
   No. 1:13-cv-233, 2014 U.S. Dist. LEXIS 192312 (S.D. Tex. Mar. 20, 2014) ......................34

*Mott's LLP v. Comercializadora Eloro, S.A.*,
   2020 U.S. Dist. LEXIS 249592 (W.D. Tex. Dec. 14, 2020) ..................48

*Omega Importing Corp. v Petri-Kline Camera Co.*,
   451 F.2d 1190 (2d Cir. 1971)............................................................49

*Paddington Corp. v. Attiki Imps. & Distribs.*,
   996 F.2d 577 (2d Cir. 1993)..............................................................37

*Park `N Fly, Inc. v. Dollar Park and Fly, Inc.*,
   469 U.S. 189 (1985)..........................................................................51

*Pebble Beach Co. v Tour 18 Ltd.*,
   155 F.3d 526 (5th Cir. 1998) ......................................................35, 36

*Petro Franchise Sys., LLC v. All Am. Props., Inc.*,
   607 F. Supp. 2d 781 (W.D. Tex. 2009)...............................................50

*Philip Morris, Inc. v. MidWest Tobacco, Inc.*,
   1988 U.S. Dist. LEXIS 16787 (E.D. Va. Nov. 4, 1988) ........................................47

*Ramada Franchise Sys., Inc. v Jacobcart, Inc.*,
   2001 WL 540213 (N.D. Tex. May 17, 2001) ................................................36, 48

*Seabrook Foods, Inc. v. Bar-Well Foods, Ltc.*,
   568 F.2d 1342 (C.C.P.A. 1977) ........................................................................38

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
   765 F. Supp. 2d 884 (S.D. Tex. 2011) ...........................................................37, 40

*Sicilia Di R. Biebow & Co. v. Cox*,
   732 F.2d 417 (5th Cir. 1984) ............................................................................37

*Streamline Prod. Sys. v. Streamline Mfg.*,
   851 F.3d 440 (5th Cir. 2017) ......................................................................43, 45

*Sunbeam Prods., Inc. v. West Bend Co.*,
   123 F.3d 246 (5th Cir. 1996) ......................................................................36, 41

*Test Masters Educ. Servs., Inc. v. Singh*,
   428 F.3d 559 (5th Cir. 2000) (*abrogated on other grounds by TrafFix Devices, Inc v
   Marketing Displays, Inc.*, 532 U.S. 23 (2001)) .................................................35

*Transparent Energy LLC v. Premier Mktg. LLC*,
   No. 3:19-cv-03022-L, 2020 U.S. Dist. LEXIS 145836 (N.D. Tex. July 28, 2020) ...........36, 47

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) .........................................................................................37

*Urgent Gear Inc. v. Savoia*,
   2001 U.S. Dist. LEXIS 20459 (N.D. Tex. Dec. 10, 2001) ...............................37, 43

*Vogt v. Tex. Instruments, Inc.*,
   No. 3:05-CV-2244-L, 2006 U.S. Dist. LEXIS 96515 (N.D. Tex. Aug. 8, 2006) ....................34

*W. v. Velo Enter. Co.*,
   No. SA-13-CV-024-OLD, 2014 U.S. Dist. LEXIS 191209 (W.D. Tex. June 9, 2014) ..........35

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000) .........................................................................................37

*Wesley-Jensen Div. of Schering Corp. v Bausch & Lomb, Inc.*,
   698 F.2d 862 (7th Cir. 1983) ............................................................................34

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) .............................................................................................34

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
    576 F.3d 221 (5th Cir. 2009) ........................................................................40, 45

**RULES**

Fed. R. Civ. P. 65(a)(2) ...................................................................................................1

**STATUTES**

15 U.S.C. § 1065 ..............................................................................................................9

15 U.S.C. § 1115(b) ..........................................................................................................9

15 U.S.C. § 1116 ............................................................................................................34

15 U.S.C. § 1125(c) ..................................................................................................47, 48

15 U.S.C. § 1127 ............................................................................................................51

17 U.S.C. § 1115 ............................................................................................................35

Clayton Act ......................................................................................................................6

Lanham Act ...........................................................................................................passim

Section 32 of the Lanham Act (15 U.S.C. § 1114) ...........................................................5

Section 43 of the Lanham Act (15 U.S.C. § 1125) ...........................................................5

Sherman Act ..............................................................................................................6, 42

Tex. Bus. & Com. Code § 16.103 .............................................................................5, 47

Tex. Bus. & Com. Code § 17.46 .....................................................................................5

Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code Ann § 15.01 et
    seq.) ............................................................................................................................6

**OTHER AUTHORITIES**

*McCarthy* § 32:178, 6 (4th ed. 2001) ............................................................................46

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:12 (4th ed.
    2001) ........................................................................................................................45

Plaintiffs Laboratorios Pisa S.A. de C.V ("Pisa") and CAB Enterprises, Inc. ("CAB") (collectively "Plaintiffs") respectfully submit this memorandum of law in support of their application for a temporary restraining order to prevent defendants PepsiCo, Inc. and Stokely-Van Camp, Inc. (together, "PepsiCo") from marketing and selling their soon-to-be-launched Gatorlyte product in a trade dress that infringes and dilutes the distinctiveness of the trade dress and/or trademarks of Plaintiffs' ELECTROLIT products, pending a preliminary injunction hearing or a combined preliminary injunction hearing and trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2).

## I.    INTRODUCTION

This is an urgent action to prevent PepsiCo from unlawfully copying Plaintiffs' products and to stop PepsiCo's unethical, monopolistic and otherwise unlawful attempts to replace Plaintiffs' products on U.S. store shelves. PepsiCo plans to release a ready to drink beverage marketed as "Gatorlyte", which is in fact a slavish copy of Plaintiffs' ELECTROLIT® brand of premium hydration beverages. If PepsiCo's Gatorlyte product launch – which is scheduled to take place this ***Sunday, February 21, 2021*** – is not enjoined, Plaintiffs will be irreparably harmed.

First developed in Mexico over seventy years ago, Plaintiffs' ELECTROLIT premium hydration beverages earned its place as a staple in many households over the past decades in this judicial district and beyond.  As a result, the ELECTROLIT brand, trademarks and trade dress are instantly recognizable to a large portion of both the U.S. and Mexican population and are associated with Plaintiffs' products and their considerable goodwill.

Envious of the ELECTROLIT brand's wild success since its formal introduction to the U.S. market several years ago, and unable to compete with ELECTROLIT beverages on the merits of the product, PepsiCo has resorted to an unethical and illegal campaign of copying and

intimidation, including using their monopoly to prevent ELECTROLIT beverages from being sold in U.S. stores altogether. PepsiCo, a repeat marketplace bully, must be enjoined from succeeding in their scheme to unlawfully intimidate, slavishly copy, and ultimately muscle out a much smaller, family-owned competitor from the U.S. market.

PepsiCo's actions have demonstrated not just a belated recognition of the market proven by ELECTROLIT's success or even a good-faith effort to compete on a level playing field, but a desire to copy and replace ELECTROLIT beverages with PepsiCo's version of the ELECTROLIT brand, no matter what it takes.

When PepsiCo purchased the Gatorade line of products in the 2000s for billions of dollars, even then federal regulators recognized the monopoly that PepsiCo was solidifying in the beverage industry and the harm that could result.  After squeaking by on a 2-2 vote of the Federal Trade Commission's antitrust investigation of PepsiCo's purchase of Gatorade's previous owner, Quaker Oats, commissioners Sheila F. Anthony and Mozelle W. Thompson warned that "PepsiCo's acquisition of Quaker Oats is unlawful and contrary to the public interest. … As a result of the Commission's failure to act today, we believe that consumers of sports drinks and, indeed, all soft drinks will suffer the consequences." Those well-founded fears have come to pass in the ensuing decades, now most recently in PepsiCo's unlawful attempt to copy and replace ELECTROLIT beverages on store shelves.

For years, PepsiCo recognized and touted the scientific benefits of electrolytes in sports and rehydration beverages.  Indeed, the Gatorade brand is built around this fundamental science.  But despite all the successes of Gatorade, PepsiCo still struggled with fully converting electrolyte science into commercial success.  PepsiCo's best efforts resulted in the powdered drink additive

that they called "Gatorlytes," sold as individual pouches for consumers to mix into other beverages like Gatorade.  The original version of Gatorlytes never took off and was a failure.

Then, in 2014, confident from its decades-long success in Mexico, Plaintiff CAB first formally introduced ELECTROLIT beverages into the U.S. market as a ready to drink premium hydration beverage.  Sales have doubled year-over-year since, and PepsiCo noticed.

Having failed with their powder pouches, and despite the billions of dollars that PepsiCo spends every year on advertising and marketing, PepsiCo realized that the quickest (albeit illegal and unethical) way to compete with Plaintiffs' ELECTROLIT beverages was to try and push it around, copy it, then use their monopoly power to kick ELECTROLIT beverages from store shelves altogether.

Late last year, when the ELECTROLIT brand's success and popularity became too much competition to tolerate, PepsiCo began their intimidation tactics, having their lawyers complain about one ELECTROLIT brand advertising claim or another, meanwhile taking notes on how ELECTROLIT brand beverages had been able to enjoy the success that had proved so elusive for PepsiCo.

Indeed, the very same ELECTROLIT brand marketing that PepsiCo's lawyers claimed was illegal was now being prominently featured by PepsiCo in their pre-launch marketing for their new ELECTROLIT clone, "Gatorlyte," which, on information and belief, is scheduled to launch on February 21, 2021.



PepsiCo's copying of the ELECTROLIT brand is not subtle or nuanced, as shown by pictures of the respective products.   PepsiCo copied nearly every distinctive feature of ELECTROLIT's trademarks and trade dress into their Gatorlyte product.  From the prominent white diagonal banner down to the positioning of the similar name, inclusion of a circular badge and solid color "Premium Hydration" / "Rapid Hydration" subtitle background, tapered lower profile and even the flavor



offerings, PepsiCo's clone is nearly complete.

Still not satisfied or confident in its ability to compete for success on store shelves, even with its ELECTROLIT clone, PepsiCo turned to its stranglehold of the store shelves themselves. In pre-launch marketing efforts directed to retailers, PepsiCo directed retailers to place Gatorlyte "next to or in place of ELECTROLIT" with a large red X-out of ELECTROLIT beverages:

4



PepsiCo's message was clear: it's us or them.  For retailers, this is not a choice at all. PepsiCo's monopolization of the sports drink market and the larger beverage market, in combination with their substantial stake in the market for foodstuffs makes it impossible for retailers to say no to PepsiCo.

As a result of PepsiCo's unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm.

To stop this unlawful conduct, and to recover the damages caused by it, Plaintiffs bring this action for injunctive and monetary relief for false designations of origin and trade dress infringement in commerce in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125); trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114) and the common law; trademark dilution in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125) and Tex. Bus. & Com. Code § 16.103; unfair competition in violation of Tex. Bus. & Com. Code

§ 17.46 and the common law; violations of common-law prohibitions against unjust enrichment and tortious interference with existing and prospective business relationships; violations of Section 1 of the Sherman Act and/or Section 3 of the Clayton Act (tying); violation of Section 1 or 2 of the Sherman Act and/or Section 3 of the Clayton Act (exclusive dealing); violation of Section 2 of the Sherman Act (monopoly leveraging and attempt to monopolize); and violation of the Texas Free Enterprise and Antitrust Act of 1983 (Tex. Bus. & Com. Code Ann § 15.01 et seq.).

## II.  STATEMENT OF FACTS

Further facts are set forth in the simultaneously filed Complaint, including all exhibits thereto.

### Pisa and ELECTROLIT

Pisa's origins date to 1945 in Mexico and the formation of Productos Infantiles, S.A., PiSA, which primarily developed and sold medicinal products for children and infants. In 1950, ELECTROLIT products were developed as a solution for dehydration in children, a crucial need during a wave of cholera striking Mexico at the time. Ochoa Decl. ¶ 3. The photograph below shows early ELECTROLIT brand product.



Productos Infantiles, S.A., PiSA became Laboratorios Pisa S.A. de C.V in 1955 amid the growth sparked by ELECTROLIT products. Over the years, ELECTROLIT beverages have proven

to be wildly successful products among children and adults alike and have emerged as Pisa's leading product, selling over 200 million bottles in 2016 alone—2 for every person in Mexico. Manufacturing ELECTROLIT beverages employs over 17,000 people in nine plants. Ochoa Decl. ¶ 4. With this investment, Pisa has built the capability to manufacture 2 billion ELECTROLIT bottles per year. Today, due to the success of the ELECTROLIT brand and Pisa's other health and pharmaceutical products, Pisa is the largest pharmaceutical company in Mexico and Latin America.

In 2014, CAB was formed in the United States and was appointed the exclusive authorized distributor in the United States for ELECTROLIT product. Ochoa Decl. ¶ 5, 14. In connection therewith, CAB was granted a license to the trademarks, copyrights and trade dress associated with U.S. ELECTROLIT products described below and was tasked with translating the overwhelming success of the ELECTROLIT brand in Mexico into a similar dominance in the U.S. market. Ochoa Decl. ¶ 6, 14.

Today, CAB distributes ELECTROLIT beverages to over 30,000 accounts in the United States. Ochoa Decl. ¶ 9. ELECTROLIT beverages are sold to consumers in the United States through several channels, including online through retailers such as Amazon as well as through supermarkets, convenience stores and all grocery store formats. Ochoa Decl. ¶ 10.

Pisa is the owner of the following "Pisa" and "ELECTROLIT" trademarks and CAB is the sole licensee in the United States of these registered trademarks (collectively, the "ELECTROLIT Marks"), one or more of which appear on packaging and advertisements for all U.S. ELECTROLIT products:

| Mark | U.S. Reg. No. | Reg. Date | Relevant Goods |
|---|---|---|---|
|  | 4222726 | Oct. 9, 2012 | *Class 5:* Electrolyte replacement solution for oral rehydration. *Class 32:* Oral rehydration beverages, namely, sports drinks. |
| "ELECTROLIT" | 4833885 | Oct. 13, 2015 | *Class 5:* Pharmaceutical products, namely, electrolyte replacement solutions; veterinary products, namely, dog, horse, pig, cat, bird, and ruminant food, bacterial and bacteriological preparations for veterinary use, chemical reagents for veterinary purposes, enzymes for veterinary purposes, diagnostic preparations for veterinary purposes, veterinary vaccines; hygienic products, namely, skin cleansing solutions for medical use; dietetic substances for medical use, namely, diet pills, diet capsules, and diet drinks; baby food; poultices; wound dressings; dental poultices; dental mold poultices; disinfectants for home use; products for the destruction of harmful animals, namely, insecticides and pesticides; fungicides; herbicides. *Class 32:* Beers; mineral waters; carbonated beverages; non-alcoholic beverages, namely, water, flavored water; fruit beverages and juices; syrups for making beverages. |
|  | 4717350 | Apr. 7, 2015 | *Class 5:* Electrolyte replacement solutions for oral rehydration. *Class 32:* Oral rehydration beverages, namely, sports drinks containing electrolytes. |

| Mark | U.S. Reg. No. | Reg. Date | Relevant Goods |
|---|---|---|---|
|  | 4717232 | Apr. 7, 2015 | *Class 5:* Electrolyte replacement solutions for oral rehydration.<br>*Class 32:* Oral rehydration beverages, namely, sports drinks containing electrolytes. |

Ochoa Decl. ¶ 11. True and correct copies of the registrations for the ELECTROLIT Marks are attached to the Complaint as **Exhibit 1**.

Since long prior to PepsiCo's acts complained of herein and through the present, Pisa and/or CAB have made continuous use of the ELECTROLIT Marks in connection with U.S. ELECTROLIT products and plan to do so in the future. Ochoa Decl. ¶ 15.

The ELECTROLIT Mark registrations are valid, subsisting and (with the exception of Reg. No. 4833885) incontestable and constitute conclusive evidence of Pisa and CAB's exclusive right to use the ELECTROLIT Marks for the goods specified in the registrations. 15 U.S.C. §§ 1065, 1115(b).

Plaintiffs use distinctive packaging (the "ELECTROLIT Trade Dress") to distinguish its U.S. ELECTROLIT products in the marketplace. Ochoa Decl. ¶¶ 12-13. Pisa owns, and CAB is the U.S. sole licensee with respect to, the ELECTROLIT Trade Dress, which consists of, but is not limited to the packaging illustrated below:



Ochoa Decl. ¶ 12. Plaintiffs have used the ELECTROLIT Trade Dress pictured above on U.S. ELECTROLIT product since at least as early as 2014 and through the present date. Plaintiffs are currently using the ELECTROLIT Trade Dress in commerce and in connection with their sale of U.S. ELECTROLIT and plan to continue such use in the future. Ochoa Decl. ¶ 13.

The ELECTROLIT Trade Dress is arbitrary, non-functional and distinctive.

The ELECTROLIT Marks and ELECTROLIT Trade Dress have been extensively and continuously used by Plaintiffs and are inherently distinctive and/or have become distinctive through the acquisition of secondary meaning. Ochoa Decl. ¶ 13.

Since the formation of CAB in 2014, $39.9 million has been spent in the United States to advertise and promote the ELECTROLIT brand in the U.S. The ELECTROLIT Marks and ELECTROLIT Trade Dress is prominently displayed in Plaintiffs' advertising and promotional materials.

Plaintiffs advertise and promote the ELECTROLIT brand in the U.S. through various means, including electronic media, print media, promotional and point of sale materials, presence at live events and through various social media channels, including Facebook and Instagram. Ochoa Decl. ¶¶ 7-8.

As a result of Plaintiffs' extensive sales, promotion and advertising of the ELECTROLIT brand, the ELECTROLIT Marks and Trade Dress have become famous among the consuming public of Texas and the United States and represent valuable goodwill to Plaintiffs. Ochoa Decl. ¶¶ 15-17. The ELECTROLIT Marks and Trade Dress are also famous among the general consuming public in Texas, especially in West and South Texas. *Id.*

Pisa's use of the ELECTROLIT Marks dates back to the 1950s and the ELECTROLIT Marks have been in continuous, exclusive use since that time. Ochoa Decl. ¶ 3, 13, 15. CAB began using the ELECTROLIT Marks and Trade Dress in the U.S. in 2014 and since then has spent tens of millions of dollars on advertising and promotion of the ELECTROLIT Marks and Trade Dress among the general consuming public in the U.S. CAB's advertising and promotion efforts have resulted in over 2.2 billion advertisement impressions across 13 markets in the U.S. with a 70% reach per market, as well as over 4.5 million social media engagements. Ochoa Decl. ¶¶ 5, 8.

As a result of Plaintiffs' efforts, in addition to the popularity of the ELECTROLIT product itself, the ELECTROLIT Marks and Trade Dress have become household names among the general consuming public in the U.S. Ochoa Decl. ¶¶ 15-17. In addition, the ELECTROLIT products, Marks, and Trade Dress have been wildly successful in Texas, especially south and west Texas. *Id.* The exponential growth of sales of ELECTROLIT beverages in the U.S. and total sales volume also evidence the fame of the ELECTROLIT Marks and Trade Dress, with over 93 million bottles sold in the U.S. since 2014 and 47 million in just the last year.

11

**PepsiCo and Its Unlawful Conduct**

One of the beverage brands sold by PepsiCo is Gatorade, a ready to drink sports drink. PepsiCo also sells a separate powder (not a ready to drink beverage) that they originally called "Gatorlytes" that PepsiCo claims "is a five electrolyte blend … designed for athletes with high electrolyte loss, salty sweaters and cramp-prone athletes." (www.gatorade.com/endurance/gatorlytes/unflavored/pouch).

On information and belief, PepsiCo plans to convert its old, powdered additive "Gatorlytes" into a new ready to drink beverage and sell it with the name "Gatorlyte" as early as February 21, 2021. Ochoa Decl. ¶ 18. PepsiCo has already begun marketing and advertising in advance of the launch of its new ready to drink Gatorlyte.  Instead of using the labeling that was already, designed, developed, and tested to work on the old "Gatorlytes" products, that was similar to the existing Gatorade family of products, PepsiCo copied the ELECTROLIT brand's look and feel by copying the label, design, and trade dress of ELECTROLIT branded products. Ochoa Decl. ¶¶ 19-21, 23-24. PepsiCo even took the drastic step of changing the product's name from plural "Gatorlytes" (a reference to the mix of different electrolytes in the product's formulation) to the singular "Gatorlyte" in an effort to make their product name sound similar to the successful ELECTROLIT brand name.

On information and belief, PepsiCo was aware and envious of the tremendous success that Plaintiffs have worked to achieve with their ELECTROLIT brand and sought to trade off the goodwill of and piggyback on the ELECTROLIT brand's success.

PepsiCo set about to launch their own ready to drink electrolyte beverage to capture the market that ELECTROLIT brand's success had proven exists.  In a crude reference to the

ELECTROLIT brand's success in Mexico, PepsiCo dubs its target market for Gatorlyte "the Hispanic consumer."

However, instead of innovating and competing fairly, PepsiCo chose to take a different, more familiar path.

Upon information belief, PepsiCo created an unethical and illegal business plan to target the "Hispanic consumer" that would utilize PepsiCo's marketing, manufacturing, distribution and legal departments to replace ELECTROLIT beverages with a copied version from PepsiCo.

In concert with and with knowledge that PepsiCo's business teams were developing an illegal copy of ELECTROLIT beverages, with the exact same branding and marketing slogans behind the scenes, PepsiCo deployed its legal department to intimidate plaintiffs with false claims. In November, 2020, Defendant Stokely had their "Senior Director Legal," Brett Well, send plaintiff CAB a threatening letter making hollow claims about ELECTROLIT advertising, alleging that some of the marketing statements made about ELECTROLIT products were untrue. Ochoa Decl. ¶ 25.



At the same time, however, PepsiCo was hatching its plot to copy the very same marketing statements from ELECTROLIT's advertising and trade dress for its copycat Gatorlyte products. *Id.* Accordingly, on information and belief, PepsiCo utilized their legal threats not out of some genuine legal concern, but as a marketing ploy driven by the business decisions of PepsiCo to unfairly compete with Plaintiffs.

For example, PepsiCo complained about ELECTROLIT advertising's use of the term "instant hydration" and the claims that it is "perfectly formulated to work faster" and contains an "optimal formula to hydrate faster than any sports drink" and demanded that ELECTROLIT advertising cease using those terms. Ochoa Decl. ¶ 26. Meanwhile, on information and belief, PepsiCo itself was finalizing its plans to advertise Gatorlyte the same way - with the claim that it offers "rapid rehydration" and has an "optimized formula for faster absorption." *Id.*

As another example, PepsiCo complained about ELECTROLIT advertising's use of the term "scientifically superior" while at the same time, on information and belief, it was finalizing

its plans to advertise Gatorlyte with the claim that it is "scientifically formulated." Ochoa Decl. ¶ 27.

In another example, PepsiCo complained about ELECTROLIT advertising's claim that it "prevents cramps," yet made the claim that its old Gatorlytes powder was "designed for … cramp-prone athletes." Ochoa Decl. ¶ 28.

On information and belief, PepsiCo conducted market and consumer research studies to study the effectiveness of ELECTROLIT's marketing, advertising, packaging and flavor selection with consumers in preparation for producing its Gatorlyte product.  As one result of this research, PepsiCo concluded that "ELECTROLIT's buyer base is drawn to 'rehydration benefits' from high electrolyte content."

When these efforts to directly intimidate plaintiffs into opening a marketing vacuum for PepsiCo's Gatorlyte product to fill failed, PepsiCo fell back on its undeniable advantage: size. Ochoa Decl. ¶ 29. PepsiCo sent out its sales force to countless distributors and retailers that sold its wide range of other beverages to demand that they make room for Gatorlyte, and not just anywhere. *Id.*  Drawing on its existing share of cooler space at retail outlets, PepsiCo demanded that Gatorlyte be positioned in "incremental" space relative to other Pespico beverages that is "next to or in place of ELECTROLIT." *Id.*

PepsiCo did not rely on intimidation of plaintiffs, distributors or retailers alone to set the stage for Gatorlyte's launch.  Ochoa Decl. ¶ 30. PepsiCo copied ELECTROLIT trademarks and trade dress too. *Id.*

As they have been for years, PepsiCo's Gatorade products are sold with their own round bottle shapes, labels and graphics, as shown below. Ochoa Decl. ¶¶ 23-24.

15



Gatorade bottles are cylindrical and feature rounded shoulders, a double upper groove and a square bottom corner profile.  The labels are do not contain diagonal banners, nor does the full "Gatorade" name appear prominently on the labels.  Instead, Gatorade bottles use a white "G" and integrated orange lightning bolt as their most visually prominent and consistent feature:





16

PepsiCo's old Gatorlytes powder pouches feature similar banding to Gatorade, G2 and G Zero, as shown below:



These pouches are branded with a predominantly silver and gray label, minimized product name and lack of diagonal banners, circular badges or solid color subtitle backgrounds.  The most prominent feature, in the largest typeface, is the white "G" with integrated orange lightning bolt, the same as is featured on the rest of the Gatorade family of products, as discussed above.

In contrast, ELECTROLIT beverages have been sold in a square-shaped bottle for decades and has been sold at least since its introduction into the United States with a diagonal lower left to upper right white banner label with circular badge, solid background subtitles and other distinctive features. These elements became synonymous with the ELECTROLIT brand in the minds of consumers.

Instead of sticking to its own Gatorade branding and packaging for its new Gatorlyte product, however, PepsiCo abandoned its Gatorade and Gatorlytes packaging and copied the ELECTROLIT brand's bottle design, shape, and label. As shown in the accompanying pictures, the trade dress for Gatorlyte mimics so many key elements of the unique, distinctive ELECTROLIT trade dress that it cannot be the result of sheer coincidence.

The square bottle shape of ELECTROLIT beverages is copied in the Gatorlyte product, in contrast with the cylindrical shape of the Gatorade bottle.

17



The prominent lower left to upper right diagonal white banner of the ELECTROLIT product label is copied in the Gatorlyte product, down to the proportions, angle, and amount of coverage on the bottle's flat front face.



The full recitation of the ELECTROLIT name is copied in Gatorade's product by recitation of the full Gatorlyte name, in identical scale and placement and overlaid on the same diagonal white banner to the ELECTROLIT name.

  

The solid background "Premium Hydration" subtitle on the ELECTROLIT product label is copied in the solid background "Instant Hydration" subtitle on the Gatorlyte label.

  

The circular badge on the label of ELECTROLIT products is copied in the label of the Gatorlyte product.

  

The placement of the graphic element of an ELECTROLIT trademark is copied in the Gatorlyte label by the placement of the "G" graphic above and to the right of the full product name recitation.

  

The multi-color graphic element of an ELECTROLIT trademark is also copied in the Gatorlyte label by the vertically arrayed multi-color graphic element on the side of the Gatorlyte bottle.

  

The ELECTROLIT branded bottle features two grooves circumscribing the bottle at upper and lower portions thereof, the relative positioning and scale of which are copied in the design of the Gatorlyte bottle.



21

The profile of the lower portion of the ELECTROLIT branded bottle transitions from gently tapered near the lower groove to a sharper radius at the bottom of the bottle, a design that is copied in the profile of the Gatorlyte bottle.

  

In sum, a consumer, undoubtedly familiar with the market-dominant Gatorade brand, would be much more likely to believe (incorrectly) that the Gatorlyte product is affiliated with the ELECTROLIT brand than it is with Gatorade, PepsiCo or any other product of PepsiCo. Ochoa Decl. ¶ 31. On information and belief, this confusion is intentionally induced by PepsiCo and a core part of their marketing strategy for Gatorlyte.

The graphic and design-based elements of the ELECTROLIT Trademarks and Trade Dress take on an increased importance among consumers that do not speak English as a first language, English being the language of both the U.S. ELECTROLIT product label and the Gatorlyte product label.  Thus, PepsiCo's overt targeting of "the Hispanic consumer" in their Gatorlyte marketing efforts, who are more likely than many other consumer groups to not speak English as a first language, makes it even more likely that its copying of the graphic and design elements of the

ELECTROLIT Trademarks and Trade Dress causes confusion among PepsiCo's target market as to the true source or origin of Gatorlyte.

The ELECTROLIT Trade Dress is protectable and infringed. The ELECTROLIT Trade Dress is intended to be and has the effect of signifying the source of the product and is not merely utilitarian.

Specifically, the ELECTROLIT branded packaging and Trade Dress is not a common or basic shape and design but rather is a distinctive square shape and distinctive design, including with its white diagonal banner, circular badge and solid color subtitle background. This Trade Dress serves to automatically create an association between the product and the source of the product in the minds of the public. Further, as explained above, Plaintiffs have penetrated the sports drink market with over 93 million bottles sold since 2014 and have created a brand that is distinctive to its consumers, including through their expenditure of over $39.9 million on advertising and marketing.

PepsiCo's use of the ELECTROLIT Marks and Trade Dress is likely to cause confusion as to the source of the product. Ochoa Decl. ¶ 31. As a result of Plaintiffs' extensive sales, promotion and advertising of the ELECTROLIT brand, the ELECTROLIT Marks and Trade Dress have become famous among the consuming public of Texas and the United States and represent valuable goodwill to Plaintiffs. Ochoa Decl. ¶¶ 15-17. The ELECTROLIT Marks and Trade Dress are also famous among the general consuming public in Texas, especially in West and South Texas. *Id.* PepsiCo has adopted a substantially similar trade dress with a square bottle, a white diagonal banner, a circle badge, and a solid color subtitle background. As explained above, the products are similar and are intended to reach the same consumers in the sports drink market, including through similar advertising channels. Ochoa Decl. ¶ 33. PepsiCo's nefarious intent is

23

plain here where it has suggested that retailers abandon ELECTROLIT beverages in favor of Gatorlyte. Finally, PepsiCo's Gatorlyte branding and packaging is likely to at least cause initial interest confusion in consumers, where consumers are not likely to invest substantial time and effort into making a low-cost decision such as which sports drink beverage to purchase. Ochoa Decl. ¶¶ 31-32. Consumers are also likely to be confused between the two products where ELECTROLIT beverages and Gatorlyte are direct competitors in the sports drink market and consumers are likely to view ELECTROLIT products and Gatorlyte product packaging and advertising prominently and frequently.

Finally, the application of the name "Gatorlyte" to the label does nothing to dispel consumer confusion. For example, the product names are not the most prominent features of the Gatorlyte and ELECTROLIT branded bottles. Rather, the most prominent features on the products are the features that the products have in common, such as a square bottle shape, a white diagonal banner, a circle badge, and a solid color subtitle background. At best, a consumer would have to closely examine the products to dispel his or her confusion.

PepsiCo's decision to slavishly copy so many elements of the ELECTROLIT branded packaging and label thus appears to be a calculated attempt to associate Gatorlyte with the ELECTROLIT brand rather than with the well-known Gatorade brand (a brand name that does not appear on the face of the Gatorlyte label).

PepsiCo's willful trade dress infringement is all the more apparent when viewed in light of PepsiCo's other products in this category, none of which have used this bottle shape, diagonal banner label with circular badge, or solid background subtitles. PepsiCo's first entry in the category was the unsuccessful Gatorlyte powder, sold in pouches, and it did not share any of these design elements. The Gatorlyte powder patches did, however, share design elements with

24

PepsiCo's Gatorade brand of products, which themselves were packaged in differently shaped bottles from ELECTROLIT branded products, with different colors and label designs. On information and belief, Gatorlyte powder is designed to look like part of the Gatorade family of products. When it became clear that Gatorlyte's powder formulation was not going to succeed in the marketplace, PepsiCo elected to launch a hydration beverage designed to compete with ELECTROLIT branded products. Notably, however, PepsiCo departed from its longstanding Gatorade design when it launched its copycat ELECTROLIT product. The Gatorlyte beverage instead is designed as part of an intentional scheme to confuse consumers and misappropriate the goodwill Plaintiffs have developed in its ELECTROLIT brand—to wit, the Gatorlyte beverage is designed to appear as part of the ELECTROLIT family of products. PepsiCo deliberately dropped or radically de-emphasized the key identifiers of the Gatorade brand and instead adopted the key elements of the ELECTROLIT Trade Dress.

PepsiCo's previous designs for Gatorade branded products demonstrates that it knows how to design non-infringing trade dress when it wants to do so. Indeed, PepsiCo designed non-infringing trade dress for its failed Gatorlyte powder product. As noted above, the similarity between the accused Gatorlyte and ELECTROLIT trade dresses are all the more striking when viewed in light of PepsiCo's other similar products.

PepsiCo's Gatorlyte branding and packaging is likely to cause initial interest confusion in consumers, particularly where consumers are not likely to invest substantial time an effort into making a low-cost decision such as which electrolyte beverage to purchase. Consumers are also likely to be confused between the two products where ELECTROLIT beverages and Gatorade are direct competitors in the electrolyte beverage market and consumers are likely to view Gatorlyte and ELECTROLIT branded product packaging and advertising prominently and frequently. On

25

information and belief, Gatorlyte products also will be purposefully sold in some of the same supermarkets, pharmacies, and neighborhood stores that currently carry ELECTROLIT products – "next to or in place of ELECTROLIT" if PepsiCo has its way. PepsiCo's trade dress infringement is exacerbated by their deceptive marketing and sales practices. PepsiCo's clear instruction to retailers to place Gatorlyte "next to or in place of ELECTROLIT" is a blatant attempt to increase consumer confusion.

The ELECTROLIT branded product design and packaging is intended to be and has the effect of signifying the source of the product and is not merely utilitarian.

Finally, the label "Gatorlyte" does nothing to dispel consumer confusion, where the product names are not the most prominent feature of the bottle. Rather, the most prominent features on the products are the features that the products have in common, such as a white banner and a circular badge. At best, a consumer would have to closely examine the products to dispel his or her confusion given the striking similarity between the products' respective trade dress.

PepsiCo's tactics, while unlawful, are not unfamiliar.  With competitors large, and small, PepsiCo has tried all this before.

In 2006, PepsiCo was sued for copying the trade dress and product formulation of Glacéau's highly successful VitaminWater product, after multiple failed attempts to introduce similar original products to the market. PepsiCo was likewise accused of instigating deceptive and harmful marketing and sales practices, and had even attempted to buy the VitaminWater brand before launching its copycat product instead. Upon information and belief, in response to these allegations, rather than risk a finding of infringement, PepsiCo changed its packaging before the Court ruled on VitaminWater's claims.

In 2002, a Texas jury assessed *$54 million* in exemplary damages against PepsiCo after finding business and/or product disagreement, wrongful interference with prospective contractual relations, and fraud. PepsiCo had tested an Austin, Texas company's invention under the guise of adding it to the system of PepsiCo beverage-dispensers if it met certain criteria. However, instead of paying for the feature, PepsiCo copied it and then disparaged the invention and MaximICER, the inventing company, to potential customers while marketing its own competing product.

Upon information and belief, rather than compete with its own failing, but unique, products, PepsiCo resorts to copying the great ideas of its competitors and using its immense marketplace weight and nationwide distribution network to swamp the market with confusingly similar copycat products.

When it cannot copy the products of its competitors, PepsiCo, on information and belief, adopts confusingly similar names for its products. In April of 2011, Polar Corp. obtained a preliminary injection blocking PepsiCo from selling its frozen slush drink Polar Shock as the product name was confusingly similar to that of Polar Corps. Less than two months after that decision, PepsiCo settled the case.

PepsiCo's unfair business practices extend beyond trademark misappropriation as well. In January of this year PepsiCo was sued by Quash Seltzer for tortious interference with existing contracts and with prospective business relations on the alleged grounds that PepsiCo threatened Quash's prospective distribution partners into not doing business with or even exploring a relationship with Quash relating to the distribution of a new hard seltzer product. And in late 2019 a jury ordered PepsiCo to pay nearly $3 million over claims that PepsiCo had undercut the prices of a family-owned Iowa-based bottling company and failed to reimburse the bottler as it had previously agreed.

PepsiCo does not reserve its schemes for small competitors, either. In 2005, PepsiCo was found liable for infringing a patent held by its prime competitor, Coca-Cola Co., and a jury assessed reasonable royalty damages of over $4 million against PepsiCo.

More recently, in 2011, PepsiCo faced claims of trade dress misappropriation and design patent infringement, along with Texas and Georgia state anti-dilution laws, brought by Coca-Cola Co. for the sale of PepsiCo's copycat Trop50 juice bottle design. The background to the case is a familiar one - after failing with its own cardboard carton design for its Trop50 juices, PepsiCo tried a clear plastic bottle with an oversized green closure that was alleged to be "virtually indistinguishable" from Coca-Cola's successful and highly-reputable Simply Orange orange juice. Sales took off, and Coca-Cola brought suit. Facing the prospect of owing compensatory and punitive damages, PepsiCo settled the case less than six months after the complaint was filed.

If there were any lingering doubt about PepsiCo's history of bad faith, it is resolved by the fact that their decision to launch a knock-off product in so confusingly similar a trade dress came only after PepsiCo first attempted to clear the market of ELECTROLIT's successful and legally appropriate advertising by disingenuously complaining about that advertising (which PepsiCo would later copy for its own use). PepsiCo then set out to copy every aspect of the ELECTROLIT brand, coupled with deceptive marketing and sales practices. Plaintiffs have documented coercive instructions to distributors and retailers to place Gatorlyte "next to or in place of ELECTROLIT." This reflects a deliberate attempt by PepsiCo and its agents to use deceptive tactics in the marketplace, and Pepisco's outsized influence, to capitalize on the confusing similarity between Gatorlyte and ELECTROLIT branded beverages. This heightens the likelihood that consumers will purchase Gatorlyte products when they mean to purchase ELECTROLIT branded products.

PepsiCo's unlawful conduct is causing and will continue to cause serious and irreparable harm to Plaintiffs. Not only will retailers and consumers be confused into purchasing Gatorlyte when they want ELECTROLIT beverages, but also PepsiCo will be able to overwhelm the market at a critical time, amidst the throes of a global pandemic. This conduct, if not enjoined, will eviscerate the goodwill Plaintiffs' have spent years carefully cultivating for its ELECTROLIT brand.

**The Product Markets and Gatorade's Market Power**

***The Sports Drink Market***

The U.S. market for sports drinks products is a clearly defined antitrust market.  The U.S. is a naturally defined geographic area with sports drink manufacturers engaged almost exclusively in nationwide distribution that naturally stops at the U.S. border for numerous reasons, including regulatory and tax issues.  Consumers in the U.S. largely share the same consumption patterns, with very little in the way of regional variance.

Consumers do not generally consider sports drinks interchangeable with other beverages, including sodas, juices, or waters.  Sports drinks are typically consumed for their flavor profile in connection with athletic activity, but consumers generally do not consider them to be related rehydration beverages that may be used for medical purposes such as acute dehydration.

The U.S. sports drink market is comprised primarily of longstanding brand names that have historically been tied to professional and collegiate athletics.

Brands such as PepsiCo's Gatorade have long dominated the sports beverage market.  In fact, Gatorade was first introduced to the National Football League in approximately 1970, and since that time has become an iconic part of professional sports, from the logo-blazoned cups on the sideline to the requisite Gatorade shower after major victories.

PepsiCo's Gatorade is not just an iconic part of sports drink market.  It is also a holder of monopoly power.  Major U.S. news sources have declared that "Gatorade dominates the U.S. sports drink category, holding a 72.1% market share of retail sales" and the next leading contender, "Coke's Powerade," falls a "distant second, with a 16.1% share." https://www.cnbc.com/2020/02/02/gatorade-and-powerade-try-to-adapt-as-sports-drinks-sales-decline.html

PepsiCo's dominance in the sports drink market is perpetuated, in part, by high barriers to entry in the market.  For instance, Gatorade's more than 50-year history has led to entrenched buyer preferences.  That PepsiCo's competitor Coca-Cola has not been able to erode PepsiCo's market share in the sports drink market notwithstanding the financial and logistical backing that Coke provides to Powerade demonstrates that start-ups and new market entrants face insurmountable barriers that cannot be overcome solely by additional investment and product development.

Moreover, Gatorade benefits from the economies of scale PepsiCo's vast and worldwide production and distribution of other beverages, PepsiCo's longstanding relationships with thousands of distributors and retail channels nationwide, and its ability to force retailers to invest and make permanent advertising and signage material to "lock in" the Gatorade brand.

PepsiCo's high market share combined with its dominant position within the sports drink industry, buyers' entrenched preferences, and PepsiCo's incredibly vast distribution network have resulted in Gatorade having monopoly power, the ability to exclude competitors, and the ability to control prices.

***The Rehydration Drink Market***

The U.S. rehydration drink market is a new, and quickly growing separate and distinct beverage market.  The rehydration drink market is limited to the U.S. for the same regulatory, tax, and consumer preference reasons as the sports drink market.

The rehydration market is comprised of electrolyte-laden beverages that are primarily intended to address or alleviate symptoms of dehydration, and are not typically marketed as a beverage for ordinary consumption.  Customers do not typically consider sports drinks and rehydration drinks to be interchangeable . or economic substitutes.

Brand competitors within the rehydration drink market include, for example: ELECTROLIT, Pedialyte, Biolyte, Recover 180, Kinderlyte, NOOMA Organic Electrolyte, Roar Organic Electroyte and, now, Gatorlyte.

The U.S. rehydration drink market has consistently grown since the ELECTROLIT brand entered the market, and the ELECTROLIT brand has steadily gained market share within the rehydration drink market because consumers like the taste, believe that ELECTROLIT products perform well, and believe they are appropriately priced.

**PepsiCo's Anticompetitive Conduct**

Unsatisfied with its existing monopoly power in the sports drink market, PepsiCo has taken steps to exclude its competitors from the rehydration drink market and to acquire and maintain additional market power.  To that end, PepsiCo engages in a strong-arm campaign by "suggesting" that retailers replace competing beverages such as ELECTROLIT beverages with PepsiCo's Gatorlyte branded beverages in written advertising placards like the one identified above.  Upon information and belief, PepsiCo makes it known that retailers are required to displace other beverages on premium shelves (or remove the competing products altogether) as a condition to being able to purchase any PepsiCo branded products.

31

PepsiCo's forced exclusive dealing practices, because they impact PepsiCo's extensive network of distributors, substantially forecloses all competitive manufacturers of rehydration drinks from the market and enables PepsiCo to charge supracompetitive prices for its Gatorlyte product.

In similar fashion, PepsiCo abuses its power in the sports drink market to expand its market power in certain growing markets and quash market participants like Plaintiffs by unfair means. Upon information and belief, PepsiCo leverages its overwhelming monopoly power in the sports drink market by conditioning the sale of Gatorade products on the sale of "new" products in the Gatorade family like Gatorlyte.  By combining these tactics, PepsiCo can use its overwhelmingly dominant position in the sports drink market to both (1) force retailers into exclusive distribution agreements rather than allowing rehydration drinks to compete fairly on flavor, taste, performance, and price; and (2) force retailers to purchase and promote Gatorlyte (the tied product in the rehydration drink market) by forcing retailers to purchase Gatorlyte if they want to have continued access to PepsiCo's other products – namely, Gatorade (the tying product in the sports drink market).

Given PepsiCo's enormous market power and nationwide distribution systems, its tying of Gatorlyte and its imposition of exclusive dealing arrangements will have an adverse impact on competition within a substantial portion of the rehydration drink market.   PepsiCo's anticompetitive business activities were intended to, and did, have a direct, foreseeable, and substantial effect on the trade and commerce within each state and among the states in the United States, including in this district.

By abusing its monopoly power, PepsiCo will be able to force competitors, including the ELECTROLIT brand, off of retailers' shelves, thereby depriving consumers of any choice in

rehydration drink, and maintain its ability to charge inflated prices to consumers by presenting them with only a single option at retailers.

***Harms Caused by PepsiCo's Actions***

In addition to monetary damages, Plaintiffs have suffered and continue to suffer irreparable harm from PepsiCo's actions.

In developing and marketing Gatorlyte products, PepsiCo has gone beyond fair competition and have adopted a trade dress that has and will confuse consumers into thinking they are buying ELECTROLIT products.

If PepsiCo is permitted to proceed, Plaintiffs will suffer irreparable harm. Most obviously, it will lose marketshare, as customers are confused into buying Gatorlyte products when they intended to buy ELECTROLIT products.

Further, Plaintiffs have spent considerable time and expense in gaining the loyalty of retailers and shelf space for its product. If PepsiCo succeeds in gaining that shelf space by virtue of their confusingly similar packaging, Plaintiffs may never be able to regain that shelf space, even if this Court later enjoins the Gatorlyte trade dress at a preliminary injunction hearing and/or a trial on the merits.

If Plaintiffs are unable to obtain a TRO in the immediate future, PepsiCo– using its prodigious marketing strength and nationwide distribution network – will be able to flood the market and capture shelf space for the critical summer selling season. The good will Plaintiffs have spent the past seven years carefully cultivating for the ELECTROLIT brand could be eviscerated by the end of the summer.

### III.    <u>ARGUMENT</u>

Once a violation of the Lanham Act is demonstrated, injunctive relief will readily issue. 15 U.S.C. § 1116. Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods … not because the infringer's goods are necessarily inferior." *Wesley-Jensen Div. of Schering Corp. v Bausch & Lomb, Inc.*, 698 F.2d 862 (7th Cir. 1983). As discussed above and in more detail below, PepsiCo's conduct constitutes at least trade dress and trademark infringement, thereby satisfying the requirements for a temporary restraining order and a preliminary injunction.

A plaintiff is generally entitled to injunctive relief when it demonstrates "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013); *Magic Valley Concrete, LLC v. Union Pac. R.R. Co.*, No. 1:13-cv-233, 2014 U.S. Dist. LEXIS 192312, at *7-8 (S.D. Tex. Mar. 20, 2014) ("An applicant must establish 'four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction[:] . . . (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm for which [the applicant] has no adequate remedy at law; (iii) that greater injury will result from denying the temporary restraining order than from its being granted; and (iv) that a temporary restraining order will not disserve the public interest.'") (quoting *Vogt v. Tex. Instruments, Inc.*, No. 3:05-CV-2244-L, 2006 U.S. Dist. LEXIS 96515, at *2 n.4 (N.D. Tex. Aug. 8, 2006)). For the reasons set forth below, Plaintiffs satisfy each of these elements.

A. **Plaintiffs Have a Strong Likelihood of Success on the Merits on Their Trade Dress Infringement, Trademark Infringement, and False Designation of Origin Claims**

To obtain a temporary restraining order and preliminary injunction, Plaintiffs can easily demonstrate that they have a likelihood of success on the merits of their trade dress infringement claims, including "present[ing] a prima facie case, but [Plaintiffs] need not prove that [they are] entitled to summary judgment." *Daniels Health*, 710 F.3d at 582 (*citing Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011)).

To prevail on a trade dress infringement claim, the plaintiff must show (1) the trade dress qualifies for protection, and (2) the trade dress has been infringed, which requires considering the likelihood of confusion. *See, e.g., W. v. Velo Enter. Co.*, No. SA-13-CV-024-OLD, 2014 U.S. Dist. LEXIS 191209, at *11 (W.D. Tex. June 9, 2014) (setting forth standard for trade dress infringement). As this Court has held, "Section 1125(a) creates a cause of action for trade dress infringement that is analogous to the common-law tort of unfair competition." *Clearline Techs., Ltd. v. Cooper B-Line*, No. H-11-1420, 2012 U.S. Dist. LEXIS 2116, at *12-13 (S.D. Tex. Jan. 9, 2012).

Substantially similar standards apply to Plaintiffs' other Lanham Act claims and Texas common-law claims. For instance, to prevail on a trademark infringement claim, the plaintiff must show "(1) that the mark or trade dress, as the case may be, qualifies for protection and (2) that [defendant's] use of the mark or trade dress creates a likelihood of confusion in the minds of potential consumers." *Pebble Beach Co. v Tour 18 Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998). To be a valid trademark that can be federally registered, "a mark must be capable of distinguishing the applicant's goods from those of others," or be "distinctive." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2000) (*abrogated on other grounds by TrafFix Devices, Inc v Marketing Displays, Inc.*, 532 U.S. 23 (2001)). A registered trademark "shall be prima facie evidence of the validity" of the registered owner's exclusive right to use the mark in commerce. 17

U.S.C. § 1115. However, in a Lanham Act action, injunctive relief is proper merely by a showing a likelihood of confusion or deception. *See Ramada Franchise Sys., Inc. v Jacobcart, Inc.*, 2001 WL 540213, at 3 (N.D. Tex. May 17, 2001) ("In a trademark infringement case, 'a substantial likelihood of confusion constitutes irreparable injury.'" (*quoting KFC Corp. v Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989))); *see also Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F.Supp. 1387, 1394 (S.D. Tex. 1989) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods."); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (CA. Tex. 1975); *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App. 2010) ("The elements in common-law trademark infringement under Texas law are the same as those under federal law."); *Transparent Energy LLC v. Premier Mktg. LLC*, No. 3:19-cv-03022-L, 2020 U.S. Dist. LEXIS 145836, at *17-18 (N.D. Tex. July 28, 2020) ("Federal unfair competition, false designation of origin, and false association claims, as well as Texas common law trademark infringement claims, all have the same elements as trademark infringement under the Lanham Act.").

As discussed below – particularly in light of PepsiCo's slavish copying of the ELECTROLIT trade dress – plaintiffs are likely to prevail on their trade dress and related claims.

### 1.     The ELECTROLIT Trade Dress Qualifies for Protection.

"'Trade dress' refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998). When identifying trade dress, the focus is not on "isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product." *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 251 n.3 (5th Cir.

1996). Trade dress is protectable if it is either inherently distinctive or has acquired secondary meaning, and is not functional. *See Dallas Cowboys Football Club, Ltd. v. America's Team Props., Inc.*, 616 F.Supp. 2d 622, 634 (N.D. Tex. 2009).

Trade dress is distinctive, and protectible, when it is "capable of identifying a particular source of the product." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 771 (1992). Distinctiveness is determined by considering the "total impression" made by the trade dress, rather than its individual elements. *Urgent Gear Inc. v. Savoia*, 2001 U.S. Dist. LEXIS 20459, at *7-8 (N.D. Tex. Dec. 10, 2001) (quoting *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993)); *see also Lady Primrose's, Inc. v. After Hours Bath Prods.*, 2000 U.S. App. LEXIS 40947, at *5-6 (5th Cir. Mar. 6, 2000) (unpublished). "The Supreme Court and the Fifth Circuit have recognized that product packaging has a tendency to be inherently distinctive." *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 897 (S.D. Tex. 2011) (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000) and *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702-03 (5th Cir. 1981) ("[T]he possible varieties of advertising display and packaging are virtually endless . . .")).

Courts routinely hold that product packaging, as opposed to product design, are inherently distinctive without the need to show that the trade dress has acquired secondary meaning for protection. *See Wal-Mart Stores, Inc.*, 529 U.S. at 214-15. Bottle and container designs are routinely protected as trade dress. *See , e.g., Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417 (5th Cir. 1984) (citrus juice bottles); *Carillon Importers Ltd. v. Frank Pesce Group, Inc.*, 913 F.Supp. 1559 (S.D. Fla. 1996 (vodka bottles); *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F.Supp. 725, 728 (N.D. Ill. 1989) ("Put succinctly, Coca-Cola's bottle represents the archetypical distinctive

mark."). Here, Plaintiffs are alleging infringement of their trade dress in their ELECTROLIT products bottle and packaging which, as in the preceding cases, are inherently distinctive.

As discussed above, the ELECTROLIT trade dress is distinctive because its packaging creates a unique, distinctive commercial impression. In measuring the inherent distinctiveness of packaging trade dress, this Circuit has applied the test from trademark cases, holding that suggestive, arbitrary, or fanciful trade dresses are inherently distinctive. *See Chevron Chem. Co.*, 659 F.2d at 702 ("If the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging," then it is inherently distinctive.). In applying these categories to trade dress, this Circuit applies the *Seabrook* test, namely: (1) is the design or shape common or basic, (2) is the design unique or unusual in a particular field, (3) is it a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods that consumers view as mere dress or ornamentation, and (4) is it capable of creating a commercial impression distinct from the accompanying words. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d at 225, 232 (5th Cir. 2010) (*citing Seabrook Foods, Inc. v. Bar-Well Foods, Ltc*., 568 F.2d 1342, 1344 (C.C.P.A. 1977)).

The ELECTROLIT trade dress qualifies as inherently distinctive under the *Seabrook* test. The ELECTROLIT trade dress is, when properly viewed as a whole, unique and unusual for electrolyte beverage products. When Pisa launched the ELECTROLIT product using the ELECTROLIT trade dress, its competitors were using and had been using containers of vastly different appearances. The ELECTROLIT trade dress, a combination of features, stood out among the various electrolyte beverage products. Because the ELECTROLIT trade dress was (and remains) distinctive, it was not a simple refinement of any existing design for electrolyte beverage

containers. The combination of features, both form and color, of the ELECTROLIT trade dress are arbitrary as applied to the product.

Moreover, even if the ELECTROLIT trade dress were not inherently distinctive (which it is), it would still be a strong mark because it has acquired secondary meaning based on the marketing and advertising Pisa and CAB have invested in the brand. For instance, Pisa and CAB's investment in the ELECTROLIT brand, and the public's appreciation for and recognition of the ELECTROLIT trade dress, has only increased since its initial launch in the U.S. market 7 years ago. For example, in 2015, CAB invested approximately $1 million in advertising and marketing the ELECTROLIT brand and product; by comparison, in 2020, CAB invested more than $19.5 million in advertising and marketing the ELECTROLIT brand and product, and has heightened the profile of the brand through savvy placement on social media, resulting in over 2.2 billion advertisement impressions (with a 70% reach in thirteen markets) and over 4.5 million social media engagements. Ochoa Decl. ¶ 8. Thanks to these efforts, sales of ELECTROLIT in the U.S. market have doubled every year since the brand was launched in 2014. Ochoa Decl. ¶ 8.

The combination of all of the elements of the ELECTROLIT package, and the unique ways in which these elements are presented, creates a unique, distinctive commercial impression. Moreover, a review of the diverse range of distinctive trade dress used by other competing products in the market demonstrates that there is nothing functional or customary about ELECTROLIT's unique look. *See Academy Ltd. v. CWGS Grp., LLC*, 2019 U.S. Dist. LEXIS 189507, at *8 (S.D. Tex. Oct. 31, 2019) (finding defendant's "years-long use of a different, non-infringing color scheme and trade dress" was convincing evidence the trade dress was non-functional and protectable).

### 2.     There Is a Likelihood of Confusion Between ELECTROLIT and Gatorlyte Products.

Likelihood of confusion is assessed in this Circuit according to the "digits of confusion" test, which includes an analysis of eight factors. *See, e.g.*, *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226-27 (5th Cir. 2009).[1] In applying these factors, it is the overall impression, not a comparison of individual features of the trade dress, that is relevant to the comparison. *Dallas Cowboys Football Club, Ltd.*, 616 F. Supp. 2d at 638.

Here, straightforward application of the "digits of confusion" factors demonstrates that confusion is inevitable:

### i. Factor 1 – The Type of Trade Dress

The first factor weighs in favor of finding likelihood of confusion because the ELECTROLIT trade dress is strong and distinctive, as discussed *supra* Section III.A.1.

### ii. Factor 2 – Trade Dress Similarity

The second factor also weighs in favor of finding likelihood of confusion because the Gatorylte packaging is very similar to the ELECTROLIT trade dress. A simple comparison of the trade dress of ELECTROLIT and the Gatorlyte packaging demonstrates that they give the same overall visual impression. Ochoa Decl. ¶¶ 18-21. "The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." *Dallas Cowboys Football Club*, 616 F. Supp. 2d at 638 (internal citation and quotations omitted). It is the overall impression, not a comparison of individual features of the trade dress, that is relevant to the comparison. *Id.*

The similarities between the respective trade dress for the two products include, at least: (i) a virtually identical square-shaped bottle with two grooves circumscribing the bottle at upper

---

[1] The "digits of confusion" test applies to both trademark and trade dress infringement alike. *See, e.g.*, *Shell Trademark Mgmt. B.V.*, 765 F. Supp. 2d at 896 (applying the "digits of confusion" factors from *Xtreme Lashes* in the context of trade dress infringement).

and lower portions thereof and a gentle taper near the lower groove to a sharper radius at the bottom of the bottle; (ii) the same diagonal lower left to upper right white banner label; (iii) a circular insignia; (iv) solid background subtitles (with similar "hydration" wording); (v) identical scale, placement and overlay of the product name; and (vi) similar placement and qualities of the graphic element.   Ochoa Decl. ¶ 20. Further, as discussed *supra* Section II., Gatorlyte's advertising language is similar to the advertising language for ELECTROLIT products, and PepsiCo changed the name of its product from plural Gatorlytes to singular Gatorlyte, to increase its similarity to the name ELECTROLIT. Any superficial differences in the details of the products' trade dress are immaterial in the face of these overwhelming similarities. *Dallas Cowboys Football Club*, 616 F. Supp. 2d at 638-39 ("exact similarity is not required").

Significantly, the mere fact that the Gatorlyte and ELECTROLIT products bear labels with their names does not change the overall similarity of the Gatorlyte packaging to the ELECTROLIT trade dress. *See Sunbeam Products, Inc. v. West Bend Company*, 123 F.3d 246, 259 (5th Cir. 1997) ("[W]e have also observed that the mere labeling of a product will not automatically alleviate likelihood of confusion."). This is particularly important when, as will be discussed below, a significant portion of the relevant consumers may not speak English as a first language. Accordingly, this factor also favors a finding of likelihood of confusion.

### iii. Factor 3 – Product Similarity

The third factor further weighs in favor of finding likelihood of confusion because Gatorlyte is a comparable product to ELECTROLIT. Indeed, based on PepsiCo's advertising, it appears that PepsiCo slavishly copied the ELECTROLIT product formulation and flavors when designing Gatorlyte. Like ELECTROLIT, Gatorlyte is a colored, electrolyte-enhanced beverage, which is being offered in a line-up of colors (pink, orange, and white) that correspond exactly to top-selling varieties of ELECTROLIT. Plaintiffs also expect the evidence to show that Gatorlyte

uses many of the same ingredients as ELECTROLIT, including a near-identical electrolyte combination. The fact that the product itself is a knock-off further heightens the likelihood that consumers will be confused by the trade dress. *See Dallas Cowboys Football Club*, 616 F. Supp. 2d at 638 (quoting *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998)) (noting that exact similarity is not required, though greater similarity results in greater likelihood of confusion).

### iv. Factors 4 and 5 – Outlet and Purchaser Identity and Advertising Media Identity

The fourth and fifth factors both weigh in favor of finding likelihood of confusion because ELECTROLIT and Gatorlyte are situated identically in the market, with both products sharing the same outlet, purchaser, and advertising media identity. Ochoa Decl. ¶ 33. ELECTROLIT and Gatorlyte are identical products that are competing in the identical market. Both are in the category of sports beverages, specifically rehydration beverages. Both products are available for sale in many of the same supermarkets, convenience stores, club stores and health clubs that currently carry ELECTROLIT, all frequented by the same targeted consumers. Further, ELECTROLIT's and Gatorlyte's advertising campaigns are directed to the same group of consumers, and the print media uses similar phrasing, as explained *supra* Section II.

In fact, Plaintiffs have already received reports that PepsiCo's agents in the field are suggesting that Gatorlyte be placed on the shelf next to or *instead of* ELECTROLIT, thus intentionally using the goodwill built by Plaintiffs to confuse consumers into purchasing Gatorlyte. Ochoa Decl. ¶¶ 34-37. The fact that ELECTROLIT and Gatorlyte products will be mixed up together on the same shelves, in the same coolers, and in the same displays significantly heightens the likelihood that consumers will be confused. *Id.*; *see also* Ochoa Decl. ¶¶ 39-40. Thus, ELECTROLIT and Gatorlyte have the same advertising media, outlet, and purchaser identities.

### v. Factor 6 – Defendant's Intent

The sixth factor weighs in favor of finding likelihood of confusion because the Gatorylte packaging was developed in bad faith, with the intent to copy the ELECTROLIT trade dress. "When a 'mark [is] adopted with the intent of deriving benefit from the reputation of [the mark holder] that fact alone may be sufficient to justify the inference that there is confusing similarity.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 482 (5th Cir. 2008). In some situations, bad faith intent (*i.e.* that the defendant intended to cause public confusion) may be inferred on the basis of "the defendant's use of the mark with 'knowledge' of the senior user's mark." *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 455-56 (5th Cir. 2017); *see Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 532 F. Supp. 1376, 1387 (S.D. Tex. 1982), *aff'd by* 701 F.2d 408 (5th Cir. 1983). Here, PepsiCo's bad faith intent is clear: rather than using its well-known Gatorade bottle and label design, - used on virtually all other Gatorade products including its Gatorlytes product – it chose to overtly copy ELECTROLIT's trade dress. Ochoa Decl. ¶ 22.

*First*, the Gatorlyte packaging is so strikingly similar to the ELECTROLIT trade dress (and so strikingly different from ELECTROLIT's other competitors) that the choice of trade dress cannot possibly have been a coincidence. *See, e.g.*, *Urgent Gear Inc. v. Savoia*, 2001 U.S. Dist. LEXIS 20459, at *13-14 (N.D. Tex. Dec. 10, 2001) (finding that the "striking similarity of the products," combined with defendant's prior knowledge of the trade dress, "is sufficient to persuade the court of defendants' intent to copy . . ."); *Lady Primrose's, Inc.*, 2000 U.S. App. LEXIS 40947, at *14 (5th Cir. Mar. 6, 2000) (unpublished) (finding the defendant's "product is so strikingly similar to their counterpart in the [plaintiff's] line that we can only infer an intent to copy."). As the junior market entrant, PepsiCo had an affirmative duty to avoid adopting packaging confusingly similar to the ELECTROLIT trade dress. *See Blue Bell Creameries, L.P. v. Denali*

43

*Co., LLC*, 2008 U.S. Dist. LEXIS 58083, at *12 (S.D. Tex. July 31, 2008) (discussing the importance of taking reasonable steps to minimize the risk of confusion); *see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1182 (9th Cir. 1987) (confirming it is the junior entrant's obligation to choose a packaging design that is sufficiently different to avoid confusion with and dilution of the distinctive ELECTROLIT trade dress). But rather than take reasonable steps to minimize the risk of confusion, PepsiCo has gone out of its way to sow confusion among consumers—it has demanded, upon information and belief, that retailers place the Gatorlyte packaging next to the ELECTROLIT products, or replace them on the shelves entirely. Ochoa Decl. ¶¶ 29-30. PepsiCo's decision to make the Gatorlyte packaging incredibly similar to the ELECTROLIT trade dress, along with strong-arming retailers to market Gatorlyte next to or as a replacement for ELECTROLIT, suggests a deliberate attempt to cause, and take advantage of, consumer confusion. Ochoa Decl. ¶¶ 41-42.

*Second*, there is no question of prior knowledge: PepsiCo intends to launch their copy-cat product mere months after enlisting lawyers to bully Pisa and CAB into changing certain language on the ELECTROLIT packaging. Ochoa Decl. ¶¶ 25-28. It is now clear that not only was PepsiCo familiar with the ELECTROLIT product and its trade dress, but they coveted it.

*Third*, the design of PepsiCo's prior nutrient-enhanced water products demonstrates that they know how to create distinctive, non-infringing packaging when they choose to do so. Neither PepsiCo's first (since failed) entry in the electrolyte beverage category, Gatorlytes powder, nor its current, highly successful Gatorade electrolyte-containing beverage, featured this square bottle shape, white horizontal banner, circular insignia, or solid background subtitles. Ochoa Decl. ¶ 24. Moreover, the Gatorade brand, under which Gatorylte is now being launched, has for years had a distinctive, unique look distinguished by highly prominent use of Gatorade's G lightning bolt logo

in the center of a circular-shaped bottle. Ochoa Decl. ¶ 25. PepsiCo's abandonment of these primary brand-identifying elements in its design for Gatorlyte demonstrates Pepsico's intent to associate Gatoryite with the ELECTROLIT brand rather than their own well-known Gatorade brand. Ochoa Decl. ¶ 25.

### vi. Factor 7 – Actual Confusion

The seventh factor likewise weighs in favor of finding likelihood of confusion. The Fifth Circuit has "set a low bar for this showing [of actual confusion], stating that a plaintiff need provide 'very little proof of actual confusion . . . to prove likelihood of confusion.'" *Streamline Prod. Sys.*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 229). "A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Id.* This Circuit has made clear that, "[e]ven if the anecdotes are minor and isolated, 'courts may not ignore competent evidence of actual confusion.'" *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 230).

While waiting for evidence of widespread actual confusion in the marketplace would result in precisely the type of irreparable harm that entry of a TRO is meant to avoid,  the similarity of the trade dress and PepsiCo's own insistence that retailers place its Gatorlyte product intermixed with ELECTROLIT will cause actual confusion upon product launch. Moreover, Plaintiffs are working with an expert to design and conduct a pilot consumer survey, the results of which Plaintiffs expert to show that an appreciable percentage of relevant consumers are likely to confuse ELECTROLIT with Gatorlyte based on similarities between the products' trade dress. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:12, at 23-70 (4th ed. 2001) (noting that courts do not require evidence of actual confusion because they recognize that such evidence is "very difficult, and often impossible to obtain") (citing cases).

Even if the pilot survey does not show confusion, the anecdotal evidence of actual confusion that will occur upon product launch still warrant entry of a TRO. That is because a

survey is, at best, a proxy for what is occurring in the marketplace, but the very nature of surveying consumers' beliefs causes them to be more careful, and pay more attention, than they otherwise would when shopping, especially for an impulse item. *McCarthy* § 32:178, at 32296 (4th ed. 2001) (noting that even the most well constructed survey is inherently artificial and therefore an "imperfect mirror of actual customer behavior under real life conditions"). Nonetheless, Plaintiffs expert that their survey will confirm that confusion is likely, which will provide further support for the finding that an appreciable number of relevant consumers will confuse ELECTROLIT and Gatorlyte because of the similarities between the trade dress.

### vii. Factor 8 – Care Exercised by Potential Purchasers

Finally, the last factor weighs in favor of finding likelihood of confusion because purchasers of single-serving electrolyte beverages are not highly trained or likely to exercise particular care. Similar low-priced products have been found likely to be subject to confusion by customers, who generally do not take the same degree of care as they might when purchasing more expensive items. *See Bd. of Supervisors for La. State Univ.*, 550 F.3d at 483. Here, because neither product is expensive – both generally cost less than a few dollars per bottle – consumers are less likely to exhibit great care in making their selection. Moreover, the purchase of a single-serving beverage is often made on impulse by consumers while they are in a store, heightening the likelihood that consumers will not exercise care and will mistakenly buy the wrong product. *See id.* at 483 (describing t-shirts, a similarly inexpensive retail product, as "impulse" buys). Indeed, Pisa and CAB expect to hear reports that this is exactly what is happening in the field: hurried consumers might grab Gatorylte off store shelves when what they mean to buy is ELECTROLIT. Ochoa Decl. ¶¶ 31-32, 38.

Moreover, PepsiCo explicitly intends to market its Gatorlyte product to the "Hispanic" market. District courts have found that different aspects of a product's trade dress take on increased

46

or decreased importance due to language barriers in that portion of the targeted consumer base. *See, e.g.*, *Levi Strauss & Bo. v. Blue Bell, Inc.*, 1978 U.S. Dist. LEXIS 16577 (N.D. Cal. July 14, 1978) (noting that at least some Spanish-speaking customers relied on the TAB to identify the product, and that the competitor could not avoid infringement by putting their own trademarked word on the TAB); *Philip Morris, Inc. v. MidWest Tobacco, Inc.*, 1988 U.S. Dist. LEXIS 16787, at *20-22 (E.D. Va. Nov. 4, 1988) (finding trade dress infringement in light of the confusion of non-English speakers in foreign countries, even where the language on the infringing product, "MIDWEST," was likely distinguishable from "MARLBORO" to English-speakers). A forthcoming survey will likely show that is exactly what would happen here. As many of ELECTROLIT's customers do not speak English as a first language, the wording on the product may have decreased significance whereas the graphic and 3D design elements may take on more significance.

****

Overall, Plaintiffs' claims are not merely likely, but virtually certain, to succeed.

### B.      Plaintiffs Have a Strong Likelihood of Success on Their Dilution Claims

To succeed on their Lanham Act and state law dilution claims, Plaintiffs need only show that: "(1) the plaintiff owns a famous and distinctive mark; (2) the defendant uses the mark in a manner that dilutes it; (3) there is association between the marks due to similarity; and (4) the association is likely to impair the distinctiveness of the mark or harm the reputation of the plaintiff's mark. *Transparent Energy*, 2020 U.S. Dist. LEXIS 145836, at *23-24; *see also* 15 U.S.C. § 1125(c); Tex. Bus. & Com. Code § 16.103. When analyzing whether a trademark is "famous," a court may consider many factors, including:

> (1) [T]he duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party; (2) the amount, volume, and geographic extent of

sales of goods or services offered under the mark in this state; (3) the extent of actual recognition of the mark in this state; and (4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

See *Mott's LLP v. Comercializadora Eloro, S.A.*, 2020 U.S. Dist. LEXIS 249592, at \*11-12 (W.D. Tex. Dec. 14, 2020); *see also* 15 U.S.C. § 1125(c)(2)(A). Unlike as in a trade dress or trademark infringement claim, there is no need to show consumer confusion to prevail on a dilution claim.[2] *See id.* at \*15, n.4. Moreover, under state law, there is no need to show actual dilution, as is required under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).

Thus, on the same facts establishing its overwhelming likelihood of success on its trademark infringement, trade dress infringement, and false designation of origin claims as explained extensively above, Plaintiffs can establish their likelihood of success on their dilution claims.[3]

## C.    Plaintiffs Are Suffering Irreparable Harm as a Result of the PepsiCo's Activities

Courts in this Circuit have stated that establishing a high probability of confusion as to source or sponsorship almost inevitably establishes irreparable harm to a trademark owner, and, in a Lanham Act action, injunctive relief is proper merely by a showing a likelihood of confusion or deception. *See Ramada Franchise Sys., Inc. v Jacobcart, Inc.*, 2001 WL 540213, at 3 (N.D. Tex. May 17, 2001) ("In a trademark infringement case, 'a substantial likelihood of confusion constitutes irreparable injury.'" (*quoting KFC Corp. v Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989)); *see also Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F.Supp. 1387, 1394 (S.D. Tex.

---

[2] Thus, even if PepsiCo seeks an opportunity to dispute the evidence of confusion that Plaintiffs have proffered, the Court need not hear or resolve such disputes in order to grant a provisional remedy based on a dilution claim.

[3] Plaintiffs are also likely to succeed on the merits of their unfair competition, unjust enrichment, tortious interference, and antitrust claim, but bring this application for a TRO and preliminary injunction based on the claims arising from PepsiCo's most egregious wrongful conduct: the obvious copying of the unique and distinctive ELECTROLIT trade dress.

1989) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods."); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (CA. Tex. 1975); *see also Omega Importing Corp. v Petri-Kline Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *Home Box Office, Inc. v Showtime/Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987) (a showing of likelihood of confusion as to source or sponsorship establishes the risk of irreparable harm as well as the requisite likelihood of success on the merits).

As set forth above, Plaintiffs have also demonstrated, apart from the rightfully applicable presumption of irreparable harm, that actual irreparable harm is taking place and will continue to take place without the Court's swift intervention. If Plaintiffs not obtain a TRO before PepsiCo is able to seize shelf space leading into the critical summer months, Plaintiffs will suffer irreparable harm. Ochoa Decl. ¶ 43. Most obviously, Plaintiffs will lose marketshare, as customers are confused into buying Gatorlyte when they mean to buy ELECTROLIT. Ochoa Decl. ¶ 44. Further, Plaintiffs have spent considerable time and expense in gaining the loyalty of retailers and shelf space for its product. Ochoa Decl. ¶ 45. If PepsiCo succeeds in gaining that shelf space by virtue of their confusingly similar packaging, Plaintiffs may never be able to regain that shelf space, even if this Court later enjoins the Gatorlyte trade dress at a preliminary injunction hearing and/or a trial on the merits. *Id.*

If Plaintiffs are unable to obtain a TRO in the immediate future, PepsiCo – using PepsiCo's prodigious marketing strength and nationwide distribution network – will be able to flood the market and capture shelf space for the critical summer selling season. Ochoa Decl. ¶¶ 46-47. The good will Plaintiffs have spent the past seven years carefully cultivating for the ELECTROLIT brand could be eviscerated by the end of the summer. *Id.*

**D.      The Balance of the Equities Is in Plaintiffs' Favor.**

Equitable factors also strongly support the Court issuing injunctive relief in this case. If no injunction is issued, Plaintiffs will suffer significant, irreparable hardship. The tens of millions of dollars that Plaintiffs already have invested in ELECTROLIT marketing will be cannibalized, the good will Plaintiffs have created in the brand will be eroded, and Plaintiffs' ability to use its trade dress and trademarks effectively to will be destroyed if PepsiCo is able to flood those markets with their knock-off product. No later action by this Court could retrieve consumers' good will towards the ELECTROLIT brand, once it has been lost. Ochoa Decl. ¶ 47.

By contrast, PepsiCo does not stand to lose nearly as much if the TRO is issued. Gatorlyte is a relatively minor product for PepsiCo in the context of PepsiCo's food and beverage empire, including its mammoth Pepsi, Diet Pepsi, Mountain Dew, Gatorade, Tropicana, Lipton and ready-to-drink Starbucks brands. Moreover, PepsiCo still could sell their product, so long as it was relabeled in nonconfusing trade dress and noninfringing trademarks. Although there might be some disruption is those sales if PepsiCo is required to re-label, such disruption will likely be very minor. *See also Lakedreams v. Taylor*, 932 F.2d 1103, 1110 n.12 (5th Cir. 1991) (noting First Circuit's view that where only hardship defendant will suffer is lost profits from activity shown likely to be infringing, such argument in defense "merits little equitable consideration") (quoting *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)).

In any event, PepsiCo knew of Plaintiffs' prior rights in the ELECTROLIT trade dress – which PepsiCo slavishly copied when designing their Gatorlyte trade dress – and accepted the risk that their product could be found infringing, and enjoined, through litigation. *See Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F. Supp. 2d 781, 797 (W.D. Tex. 2009) (holding that any harm to the defendant was outweighed, especially considering that it was "at least partially self-inflicted.").

E. **Injunctive Relief Is in the Public Interest.**

Finally, Plaintiffs' requested relief is in the public interest because "the public has an interest in preventing confusion about the origin of the products that it buys." *Lakedreams*, 932 F.2d at 1110. The Lanham Act exists "to protect the ability of consumers to distinguish among competing producers." *Park `N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum Fitness Corp.*, 83 F. Supp. 2d 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999) (citations omitted).

Injunctive relief against PepsiCo would promote the public interest by eliminating the risk of consumer confusion and stemming the flow of unlawful and unauthorized products. Moreover, issuing an injunction would protect Plaintiffs' trademark rights. This relief is consistent with the purpose of the Lanham Act to prevent "the deceptive and misleading use of marks in such commerce … to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks." *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982) (quoting 15 U.S.C. § 1127). Public policy favors brand owners being able to protect the money, time, and other investments they have made in their trademarks, and associated brands and reputations.

IV. **CONCLUSION**

For the reasons set forth above, this Court should grant Plaintiffs' request for an Order to Show Cause for Preliminary Injunction and Temporary Restraining Order in its entirety and issue an order for execution as soon as practically possible, and all other and further relief that this Court deems just and proper.

Dated: February 18, 2021

Respectfully submitted,

By: *s/ Samuel P. Bragg*

Samuel P. Bragg, Attorney-in-Charge
State Bar No.: 24097413 (Texas)
S.D. Tex. Bar No.: 3395594
**ALSTON & BIRD LLP**
2200 Ross Avenue Suite 2300
Dallas, TX 75201
Tel: 214-922-3400 / Fax: 214-922-3899
sam.bragg@alston.com

*Motion for Admission Pro Hac Vice to be Filed*
Paul Tanck
State Bar No.: 4298840 (New York)
Greg Carbo
State Bar No.: 4460101 (New York)
Neal McLaughlin
State Bar No.: 4732020 (New York)
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016
Tel: 212-210-9400 / Fax: 212-210-9444
paul.tanck@alston.com
greg.carbo@alston.com
neal.mclaughlin@alston.com

*Attorneys for Plaintiffs*