UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| LABORATORIOS PISA S.A. de C.V; AND CAB ENTERPRISES, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>PEPSICO, Inc.; AND STOKELY-VAN CAMP, INC.,<br><br>Defendants. | Civ. Action No.:<br><br>**(JURY DEMAND)** |

## **DECLARATION OF CARIDAD OCHOA**

I, Caridad Ochoa, hereby declare under penalty of perjury that:

1. My name is CARIDAD OCHOA. I am over the age of twenty-one (21) years, am competent to testify to the matters stated herein, have personal knowledge of the facts and statements in this declaration, and each of the facts and statement is true and correct.

2. I am the Commercial Director at CAB Enterprises, Inc. ("CAB"), which is one of the Plaintiffs in the above-captioned case.

### **Electrolit and its Trademarks and Distinctive Trade Dress**

3. Laboratorios Pisa S.A. de C.V.'s ("Pisa") and CAB's (collectively, the "Plaintiffs") Electrolit® product was originally developed in Mexico in 1950 as a solution for dehydration in children, a crucial need during a wave of cholera striking Mexico at the time.

4. Over the years, Electrolit® beverages have emerged as Pisa's leading product selling over 200 million bottles in 2016 alone – 2 for every person in Mexico.

5. In 2014, CAB was formed in the United States and was appointed the exclusive authorized distributor in the United States for Electrolit® product.

1

6. In connection therewith, CAB was granted an exclusive license to the trademarks and trade dress associated with genuine U.S. Electrolit® and was tasked with translating the overwhelming success of Electrolit® in Mexico into a similar dominance in the U.S. market.

7. Pisa and CAB are leveraging the success of the Electrolit® Laboratorios Pisa® brands to vigorously expand their sales of Electrolit® in the U.S.

8. Pisa and CAB's investment in the Electrolit brand, and the public's appreciation for and recognition of the Electrolit trade dress, has only increased since its initial launch in the U.S. market 7 years ago. For example, in 2015, CAB invested approximately $1million in advertising and marketing the Electrolit brand and product; by comparison, in 2020, CAB invested more than $19.5 million in advertising and marketing the Electrolit brand and product, and has heightened the profile of the brand through savvy placement on social media, resulting in over 2.2 billion advertisement impressions (with a 70% reach in thirteen markets) and over 4.5 million social media engagements. Thanks to these efforts, sales of Electrolit in the U.S. market have doubled every year since the brand was launched in 2014.

9. Today, CAB distributes U.S. Electrolit® to over 30,000 accounts in the United States.

10. U.S. Electrolit® is sold to consumers through several channels, including online through retailers such as Amazon as well as through supermarkets, convenience stores and all grocery store formats.

11. All bottles of genuine Electrolit® beverages display one or more of the following valid and subsisting Electrolit® and Pisa® trademarks, which are owned by Pisa: (collectively, the "Electrolit Marks"):

| Mark | U.S. Reg. No. | Reg. Date | Relevant Goods |
|---|---|---|---|
| Electrolit (logo) | 4222726 | Oct. 9, 2012 | *Class 5:* Electrolyte replacement solution for oral rehydration.<br>*Class 32:* Oral rehydration beverages, namely, sports drinks. |
| "ELECTROLIT" | 4833885 | Oct. 13, 2015 | *Class 5:* Pharmaceutical products, namely, electrolyte replacement solutions; veterinary products, namely, dog, horse, pig, cat, bird, and ruminant food, bacterial and bacteriological preparations for veterinary use, chemical reagents for veterinary purposes, enzymes for veterinary purposes, diagnostic preparations for veterinary purposes, veterinary vaccines; hygienic products, namely, skin cleansing solutions for medical use; dietetic substances for medical use, namely, diet pills, diet capsules, and diet drinks; baby food; poultices; wound dressings; dental poultices; dental mold poultices; disinfectants for home use; products for the destruction of harmful animals, namely, insecticides and pesticides; fungicides; herbicides.<br>*Class 32:* Beers; mineral waters; carbonated beverages; non-alcoholic beverages, namely, water, flavored water; fruit beverages and juices; syrups for making beverages. |
| Electrolit bottle (image) | 4717350 | Apr. 7, 2015 | *Class 5:* Electrolyte replacement solutions for oral rehydration.<br>*Class 32:* Oral rehydration beverages, namely, sports drinks containing electrolytes. |

| Mark | U.S. Reg. No. | Reg. Date | Relevant Goods |
|---|---|---|---|
| Electrolit | 4717232 | Apr. 7, 2015 | *Class 5:* Electrolyte replacement solutions for oral rehydration. *Class 32:* Oral rehydration beverages, namely, sports drinks containing electrolytes. |

12. Plaintiffs use distinctive packaging (the "Electrolit Trade Dress") to distinguish its genuine U.S. Electrolit® products in the marketplace. Pisa owns, and CAB is the U.S. sole licensee with respect to, the Electrolit Trade Dress, which consists of, but is not limited to the packaging illustrated below:



13. The Electrolit Trade Dress has also been extensively and continuously used throughout the U.S. by Plaintiffs and is inherently distinctive

14. CAB has the exclusive right to use the Electrolit Marks for beverages in the U.S. as a result of exclusive license and distribution agreements with the registrant, Pisa.

15. The Electrolit Marks have been extensively and continuously used by Plaintiffs, are inherently distinctive and have become famous throughout the U.S. and in Texas.

4

16. Plaintiffs have attained substantial goodwill and a strong, positive reputation as the exclusive and only source of authentic, high-quality Electrolit® beverages in the U.S.

17. Plaintiffs have invested millions of dollars developing and growing the Electrolit® brand in the U.S., with the result that the public naturally and exclusively associates the Electrolit Marks and other source identifiers with Plaintiffs.

**Defendants' Infringing Gatorlyte Product**

18. Within the next several days, it is my understanding that defendants PepsiCo, Inc. and Stokely-Van Camp, Inc. (collectively "Defendants" or "PepsiCo") plan to launch a new a ready to drink beverage with the name "Gatorlyte". This product is a slavish knock-off of Electrolit. It is a colored, nutrient-enhanced bottled water being offered in an array of colors (pink, orange, and white) that correspond exactly to top-selling varieties of Electrolit products. Plaintiffs also expect the evidence to show that Gatorlyte uses many of the same ingredients as Electrolit, including a near-identical electrolyte combination.

19. More important to me than Defendants' lack of innovation in developing their product, however, is the fact that the trade dress they designed for Gatorlyte mimics the key elements of the unique and distinctive trade dress set the Electrolit brand apart in the marketplace, that has been so critical to its success, and that is so inextricably linked to the brand itself.

20. As shown in the accompanying photographs, the similarities between the respective trade dress for the two products is simply too pronounced to have occurred by sheer coincidence. The similarities between the respective trade dress for the two products include, at least: (i) a virtually identical square-shaped bottle; (ii) the same diagonal lower left to upper right white banner label; (iii) a circular insignia; (iv) solid background subtitles; (v) predominantly two-toned labels that alternate between the white banner and another color; (vi) and bright-colored, circular caps, which are the same color no matter which flavor of beverage is contained therein. Any

superficial differences in the details of the products' trade dress are immaterial in the face of these overwhelming similarities.



| Gatorade | Electrolit | Gatorlyte |

21.     Defendants' marketing materials for the Gatorlyte brand also mimic the style and overall impression of Electrolit materials.

**Defendant's Bad Faith**

22.     Defendants' bad faith in developing the Gatorlyte trade dress is evident to me both from the history of dealings between the parties and an examination of the trade dress used on Defendant's other beverage products.

23.     Defendants' past products have all used an entirely different trade dress and, to my knowledge, have never used square-shaped bottle, diagonal lower left to upper right white banner label, a circular insignia, and predominantly two-toned labels that alternate between the white

6

banner and another color. As shown in the photo above, PepsiCo's Gatorade line of products does not share any of these design elements. Moreover, the Gatorade brand has for years had a distinctive, unique look distinguished by highly prominent use of Gatorade's G lightning bolt logo in the center of a circular-shaped bottle.

24. The distinctive, non-infringing package designs that PepsiCo created for Gatorade demonstrates to me that PepsiCo knows how to design products and trade dress in this category that can create a unique impression. There is simply no legitimate reason that they had to appropriate the distinctive look created for Electrolit.

25. It is also telling, in my view, that Defendants' decision to launch a knock-off product in so confusingly similar a trade dress came only after they first attempted to intimidate Plaintiffs out of the market. In November, 2020, Pepsico had their lawyers send plaintiff CAB a threatening letter complaining about Electrolit advertising, alleging that some of the claims CAB makes about the product were untrue. At the same time, however, on information and belief, Pepsico was hatching its plot to copy Electrolit's advertising and trade dress for its Gatorlyte products.

26. For example, Pepsico complained about Electrolit's use of the term "instant hydration" and the claims that it is "perfectly formulated to work faster" and contains an "optimal formula to hydrate faster than any sports drink" and demanded that Electrolit cease using those terms. Meanwhile, on information and belief, Pepsico itself was finalizing its plans to advertise Gatorlyte the same way - with the claim that it offers "rapid rehydration" and has an "optimized formula for faster absorption."

27. As another example, Pepsico complained about Electrolit's use of the term "scientifically superior" while at the same time, on information and belief, it was finalizing its plans to advertise Gatorlyte with the claim that it is "scientifically formulated."

7

28. In another example, Pepsico complained about Electrolit's claim that it "prevents cramps," yet made the claim that its Gatorlytes powder was "designed for … cramp-prone athletes."

29. When these efforts to directly intimidate Plaintiffs into opening a marketing vacuum for Pepsico's Gatorlyte product to fill failed, Pepsico fell back on its undeniable advantage: size. Pepsico sent out its sales force to countless retailers that sold its wide range of other beverages to demand that they make room for Gatorlyte, and not just anywhere. Drawing on its existing share of cooler space at retail outlets, Pepsico demanded that Gatorlyte be positioned in "incremental" space relative to other Pespico beverages that is "next to or in place of Electrolit."

30. Pepsico did not rely on intimidation of plaintiffs or retailers alone to set the stage for Gatorlyte's launch. Pepsico copied Electrolit trademarks and trade dress too. Having failed to intimidate Plaintiffs to creating a marketing vacuum for Pepsico's Gatorlyte product to fill, it seems that Defendants instead set out to copy every aspect of the Electrolit brand.

## Confusion and Likelihood of Confusion

31. Given the striking similarity between the products' respective trade dress, I believe there is a high likelihood that consumers and retailers will confuse the products, mistakenly buying Gatorlyte products when they mean to buy Electrolit products.

32. The likelihood of confusion is further exacerbated by the fact that nutrient-enhanced water is a relatively low-cost item (around $3/bottle), and consumers are unlikely to exercise a great deal of care before making a purchase. In fact, it is often an impulse purchase and is placed in coolers near a store's checkout counter or at the end of aisles in grocery stores.

33. The likelihood of confusion is further exacerbated by the fact that Plaintiffs appear to be marketing the Gatorlyte products and Electrolit products to the same customers and intend to sell them through the same sales channels.

34. Attached as Exhibit 1 is a true and correct copy of Gatorlyte marketing materials that was presented at one of CAB's customers.

35. The material was provided to me by one of CAB's representatives, who informed me that he received it from a sales representative of Classic Distributing and Beverage (one of CAB's distributors) after the sales representative saw it at AMPM Convenience Store (a CAB customer), in Bakersfield, CA on February 11, 2021 and took a picture of it with his cellphone.

36. Attached as Exhibit 2 is a true and correct copy of a marketing document which I obtained from the following URL:

> https://static1.squarespace.com/static/54e22d6be4b00617871820ca/t/60144b82d0a34b3eb48a192c/1611942789240/SalesSheets.pdf.

37. Upon information and belief, Gatorlyte products also are and will be available for sale in almost all of the same stores that currently carry Electrolit products – typically in the same area of the store and sometimes in the very same display, including because Defendants have requested that Gatorlyte be placed "next to or in place of Electrolit where sold." As shown below and in Exhibit 1, when Gatorlyte products are stocked next to Electrolit, it is difficult to tell them apart – to the contrary, I believe many consumers will think that Gatorlyte is Electrolit or is from the same company that makes Electrolit.



38.     I have asked our sales force to alert me to reports of confusion in the marketplace. I expect that we will receive reports of confusion in the market, including from hurried shoppers grabbing Gatorlyte when they meant to buy Electrolit to more sophisticated industry players (like retailers, distributors, bottlers and merchandisers) being confused by the similar trade dress. Nonetheless, the true amount of confusion in the marketplace will be difficult to document. Most consumers will not bother to contact us if they have been confused (or, indeed, may not even know it) and many retailers may be reluctant to come forward and risk offending PepsiCo, which has unprecedented clout in the food and beverage businesses because of its portfolio of major brands, including Pepsi, Diet Pepsi, Gatorade, Quaker, Frito-Lay, Tropicana and ready to drink Lipton iced teas and Starbucks coffees.

39.     I also expect to receive reports that bottles of Gatorlyte will be back filled behind Electrolit on retail shelves in order to make the Electrolit shelves appear full and prevent the retailer from reordering.

40. I also expect to see evidence that Defendants are engaged in a campaign to have their products shelved together with Electrolit– surrounded above and/or to the side by our Plaintiffs' products, further increasing the likelihood of confusion.

41. In my experience in this industry, this encroachment into another manufacturer's set is unprecedented. For example, one would never see a display of Pepsi products integrated into a display of Coca-Cola products, nor would one see a display of Lipton iced tea integrated into a display of Snapple, or a display of Gatorade integrated into a display of Powerade. Similar brands are separated for a reason: to protect consumers and to make it clear to consumers which products all come from a common source. By integrating the two product lines on shelves, Defendants are increasing the likelihood that consumers will inadvertently grab the wrong product.

42. Defendants' apparent determination to integrate their product with ours in the marketplace further illustrates their intent to associate their product with the Electrolit brand and will only heighten the likelihood that consumers will be confused.

**Irreparable Harm**

43. In developing and marketing Gatorlyte products, Defendants have gone beyond fair competition and have adopted a trade dress that has and will confuse consumers into thinking they are buying Electrolit products.

44. If Defendants are permitted to proceed, Plaintiffs will suffer irreparable harm. Most obviously, we will lose sales and revenues, as customers are confused into buying Gatorlyte products when they mean to buy Electrolit products.

45. Plaintiffs have spent considerable time and resources in gaining valuable shelf space for its products in retail outlets. The loyalty of these retailers and the continued availability of this shelf space is seriously threatened by Defendants' conduct and the resulting confusion among retailers. Once shelf space is lost, it is essentially impossible to regain. Defendants' use of

their confusingly designed products to capture Plaintiffs' shelf space will cause irreparable injury to Plaintiffs.

46. More importantly, Defendants' conduct will damage Plaintiffs' ability to maintain its hard-won brand recognition in the nutrient-enhanced water category, which only emerged on a national scale in recent years. Defendants will be able to flood the market through PepsiCo's mammoth distribution network. In a matter of weeks, Gatorlyte will be able to achieve broader distribution than the Electrolit brand has been able to build in seven years. Not only will retailers and consumers be confused into purchasing Gatorlyte when they want Electrolit, but additionally Defendants — with their immense marketing might and its nationwide distribution network — will be able to swamp the market with its confusingly packaged products just on the eve of Plaintiffs's most important selling season in the hot summer months. We are currently selling into retail channels to secure precious shelf space for the key selling months of June, July, and August. If not enjoined, Defendants' conduct will eviscerate the good will we have spent seven years carefully cultivating for the Electrolit brand.

47. To prevent this irreparable harm, Plaintiffs request a temporary restraining order and is proceeding by order to show cause because it cannot countenance the harm that would result if we proceeded under the slower procedures for notice of motion.

Executed on February 18, 2021 in Los Angeles, California

Caridad Ochoa
Commercial Director, CAB Enterprises, Inc.