United States District Court
Southern District of Texas
**ENTERED**
February 27, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| LABORATORIOS PISA S.A. de C.V.; and CAB ENTERPRISES, INC., §<br>§<br>§<br>Plaintiffs, §<br>§<br>VS. §<br>§<br>PEPSICO, INC.; and STOKELY-VAN CAMP INC., §<br>§<br>§<br>Defendants. §<br>§ | CIVIL ACTION NO. 7:21-cv-00062 |

## TEMPORARY RESTRAINING ORDER

The Court now considers Plaintiffs' "Notice of Emergency Motion and Motion"[1] and supporting memorandum of law,[2] Defendants' response,[3] Plaintiffs' reply,[4] and the parties' respective oral presentations at the February 26, 2021 hearing.[5] After considering the motion, record, and relevant authorities, the Court **GRANTS** Plaintiffs' motion and issues this Temporary Restraining Order.

### I. BACKGROUND AND PROCEDURAL HISTORY

This is a trademark infringement case. Plaintiff Laboratorios Pisa S.A. de C.V. is a Mexican company that owns the ELECTOLIT trademarks and Plaintiff CAB Enterprises, Inc. is a Delaware corporation that is the sole licensor in the United States for the ELECTROLIT trademarks.[6] Plaintiffs originally brought this action to enjoin Defendants' launch of a competitive product, alleged to infringe Plaintiffs' intellectual property rights, in the

---

[1] Dkt. No. 2.
[2] Dkt. No. 9.
[3] Dkt. No. 27.
[4] Dkt. No. 30.
[5] *See* Minute Entry (Feb. 26, 2021).
[6] Dkt. No. 1 at 6, ¶¶ 19–20.

"rehydration drink market."[7] This Court considered Plaintiffs' motion ex parte and granted a temporary restraining order on February 19, 2021.[8] The Fifth Circuit issued a writ of mandamus directing the Court to stay its Temporary Restraining Order,[9] which the Court did.[10]

The Court held a hearing on February 26, 2021, to hear arguments on whether the Court should issue another temporary restraining order.[11] The issue is now ripe for decision. The Court turns to the analysis.

## II.    DISCUSSION

### a.    **Legal Standard**

A temporary restraining order may issue under Federal Rule of Civil Procedure 65(b) only if: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Furthermore,

> [t]here are four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction. To prevail, Plaintiff[s] must demonstrate: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm for which it has no adequate remedy at law; (iii) that greater injury will result from denying the temporary restraining order than from its being granted; and (iv) that a temporary restraining order will not disserve the public interest.[12]

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment."[13] However, the Fifth Circuit has "cautioned

---

[7] Dkt. No. 9 at 37.
[8] Dkt. No. 16.
[9] Dkt. No. 21 at 2.
[10] Dkt. No. 22.
[11] *See* Minute Entry (Feb. 26, 2021).
[12] *Vogt v. Tex. Instruments Inc.*, No. CIVA 3:05CV2244 L, 2006 WL 4660133, at *2 n.4 (N.D. Tex. Aug. 8, 2006) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) & *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)); *accord Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).
[13] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[14]

**b. Analysis**

*1. Federal Rule of Civil Procedure 65*

Because Defendants have appeared in this case[15] and at the temporary restraining order hearing, any temporary restraining order issued will be *with* notice, so the provisions of Rule 65(b)(1) and (b)(3) are not applicable.

*2. Substantial Likelihood of Success on the Merits*

"A claim for trade dress infringement under [the Lanham Act, 15 U.S.C. § 1125(a)] requires a showing that '(1) the dress qualifies for protection, which requires considering functionality, distinctiveness, and secondary meaning; and (2) that the dress has been infringed, which requires considering the likelihood of confusion.'"[16] "The trade dress inquiry encompasses three subsidiary questions: (1) [plaintiff's] products are 'inherently distinctive' or have acquired 'secondary meaning,' (2) whether the products are 'functional,' and (3) whether there is a 'likelihood of confusion' between [plaintiff's] products and [defendant's] products."[17]

The Court emphasizes that the following analysis is not a summary judgment determination, but merely assesses whether Plaintiffs have demonstrated a prima facie case of substantial likelihood of success on the merits to merit temporary injunctive relief while the parties further marshal their arguments and evidence.

*i.  Plaintiffs' Electrolit Trade Dress Likely Qualifies for Protection*

---

[14] *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (quotation omitted).
[15] Dkt. No. 25.
[16] *West v. Velo Enter. Co.*, No. SA-13-CV-024-OLG, 2014 U.S. Dist. LEXIS 191209, at *11 (W.D. Tex. June 9, 2014) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117–18 (5th Cir. 1991)).
[17] *Lady Primrose's, Inc. v. After Hours Bath Prod., Inc.*, 211 F.3d 125 (5th Cir. 2000).

"Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product."[18] "[T]he inquiry does not focus on isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product."[19] Therefore, the focus is not on particular words or characteristics of the trade dress, but whether a logo or trade dress is "capable of creating a commercial impression distinct from the accompanying words."[20] A distinctive design "is entitled to protection from unfair competition if the bottle design is sufficiently distinctive to serve as an identifier of source."[21] "Essentially, when analyzing a 'trade dress' issue, the component parts of any particular product are largely irrelevant; the inquiry is whether the product's distinct combination of colors and features is sufficiently distinct to connote a particular producer and sufficiently arbitrary that a monopoly over that particular combination of colors and features would not stifle competition."[22] "The Supreme Court and the Fifth Circuit have recognized that product packaging has a tendency to be inherently distinctive" because the possibilities for product packaging are virtually endless, so the selection of one particular dress can serve as an identifier of its source and be protectible without unduly hindering competitors'

---

[18] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010) (quotation omitted); *see TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001) ("The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.").

[19] *Sunbeam Prod., Inc. v. W. Bend Co.*, 123 F.3d 246, 251 n.3 (5th Cir. 1997), *overruled in part on other grounds*, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).

[20] *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 508 (5th Cir. 2018) (quotation omitted).

[21] *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 426 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).

[22] *Lady Primrose's, Inc.*, 211 F.3d 125.

ability to choose their own design.[23] However, product features such as a bottle design or choice of label color[24] are functional and not protectable if they are the reason the device works, irrespective of available alternative designs, or if one maker's exclusive use of the feature would put competitors at a significant disadvantage.[25]

> The Court turns to the distinctiveness of the ELECTROLIT product and trade dress.

> Under the *Seabrook Foods* test, courts look to a set of factors [i]n determining whether a design is arbitrary or distinctive: [1] whether it was a common basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.[26]

Plaintiffs proffered adequate evidence of the distinctiveness of their trade dress as a whole. The commercial director for Plaintiff CAB Enterprises averred that Plaintiffs have a distinctive trade dress in their "square-shaped bottle, diagonal lower left to upper right white banner label, a circular insignia, and predominantly two-toned labels that alternate between the white banner and another color" that Defendants have never used or copied, and that Defendants' "Gatorade line of products does not share any of these design elements." Plaintiffs' selection of a white diagonal label, "Premium Hydration" and "Scientific Formula" badges, and prominent "Electrolit" product name complete with multicolored swooping droplets are sufficiently

---

[23] *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 897 (S.D. Tex. 2011) (Ellison, J.) (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 212 (2000) & *Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 659 F.2d 695, 702–03 (5th Cir. 1981).

[24] *See Sazerac Co. v. Skyy Spirits Inc.*, No. 95-3243, 37 U.S.P.Q.2d 1731 (E.D. La. Dec. 19, 1995) (rejecting vodka maker's argument that cobalt blue label, which was used by other vodka makers, constituted a trade dress), *aff'd*, 95 F.3d 53 (5th Cir. 1996)

[25] *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355–56 (5th Cir. 2002).

[26] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 232 (5th Cir. 2010) (alteration in original) (quotation and internal quotation marks omitted).

distinctive, for present purposes, for determining that Plaintiffs have a substantial likelihood of showing that their trade dress qualifies for protection.[27]

Moreover, the Gatorade brand has for years had a distinctive, unique look distinguished by highly prominent use of Gatorade's G lightning bolt logo in the center of a circular-shaped bottle" which is not used on GATORLYTE.[28] The Court accepts this evidence of trade dress as an adequate demonstration that "the design, shape or combination of elements [of Plaintiffs' ELECTROLIT] is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark."[29] Defendants challenge this evidence as impermissibly conclusory,[30] but offer no counter-evidence that the declaration is inaccurate, and the Court finds the averments in the declaration to be "rationally based on the witness's perception"[31] and admissible as evidence.

Defendants argue that numerous electrolyte beverages use similar elements, such as white labels and square bottles[32]:

---

[27] *Compare* Dkt. No. 1 at 4, ¶ 13 (discussing the distinctive trade dress), *with Carillon Importers Ltd. v. Frank Pesce Grp.*, 913 F. Supp. 1559, 1564 (S.D. Fla. 1996) ("Combined, these [bottle] components have an elegant, minimalist style that is suggestive of refinement and quality. Such a design is distinctive in the vodka marketplace and protectable as trade dress. Upon such a finding, it is not necessary for the Court to evaluate whether Stolichnaya Cristall has also acquired a secondary meaning.").

[28] Dkt. No. 2-2 at 6–7, ¶ 23 (emphasis added).

[29] *Amazing Spaces*, 608 F.3d at 244 (quotation omitted).

[30] Dkt. No. 17 at 5, § 3.

[31] FED. R. EVID. 701(a).

[32] Dkt. No. 27 at 30–32, ¶¶ 65–70.





However, the inquiry as to the distinctiveness of a trade dress sounds in the *total* package or

appearance.[33] Although Defendants identify similar products with white labels, square bottles,

and fully spelled-out product names, Plaintiffs claim trade dress protection in the total trade dress

of the ELECTROLIT product. Plaintiffs show that, before the introduction of GATORLYTE, no

product other than ELECTROLIT used a diagonal white label, on a square bottle, with a circular

badge printed on the product outside the white label, with a smaller rectangular emblem extolling

---

[33] *See supra* note 18.

the product's hydration benefits.[34] In addition, even the side label of GATORLYTE shares features with ELECTROLIT: the left-handed drinking man with an upraised bottle, a depiction of the product entering the body, hexagons, some major ingredients of the formula descending down the side label, and a bar at the bottom of the side label describing the product's sugar content.[35]

 

---

[34] Defendants "ignor[e] the fact that the trade dress of a product is comprised of its total image and overall appearance, not isolated components." *Sunbeam Prod., Inc. v. W. Bend Co.*, 123 F.3d 246, 258 (5th Cir. 1997) (quotations omitted), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).
[35] Dkt. No. 30 at 2–3, ¶¶ 2–4.

Moreover, Defendants ignore that *only* ELECTROLIT and GATORLYTE are sold in 20 ounce bottles; all other electrolyte beverage products that Defendants point to as similar[36] are sold in larger or smaller bottles.[37]

Defendants further argue that Plaintiffs actually disclaimed any trademark rights in the shape of their bottle during trademark registration proceedings,[38] but the case they cite in support actually found that trademark rights can exist independent of registration,[39] and the Court finds here that Plaintiffs' ELECTROLIT trademark bears such distinguishing features as a *total package*, rather than considering Plaintiffs' bottle shape in isolation.[40]

Defendants further argue that Plaintiffs' trade dress is merely functional, and so does not merit trade dress protection.[41] The Court disagrees. Although Plaintiffs' bottle, bottle design, and cap may be merely functional aspects of the ELECTROLIT product because they are "essential to the use or purpose of the article [and] affec[t] the cost or quality of an article,"[42] the total label design is hardly a merely functional aspect.[43]

In combination, the Court finds that Plaintiffs have demonstrated a prima facie case that their trade dress is sufficiently distinctive for the purposes of a temporary restraining order.[44] Even if the bottle is a common or basic shape, the label is distinctive together with the bottle because ELECTROLIT appears to have been the only unique product on the market, before GATORLYTE, in a square bottle with a diagonal white label, circular badge, and enclosed

---

[36] *See* Dkt. No. 27-5 at 7, ¶ 20.

[37] *See* Dkt. Nos. 27-20 to 27-35.

[38] Dkt. No. 27 at 33, ¶¶ 72–73.

[39] *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 975 (D. Neb. 2008).

[40] *See Union Nat'l Bank of Tex. v. Union Nat'l Bank of Tex.*, 909 F.2d 839, 844 (5th Cir. 1990).

[41] Dkt. No. 27 at 31, ¶¶ 67–68.

[42] *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (quotation omitted).

[43] *See infra* note 45.

[44] The Court does not find that Plaintiffs have shown secondary meaning. Plaintiffs only argue that they have spent substantial sums on advertising ELECTROLIT. Dkt. No. 9 at 45. But "spending substantial amounts of money does not itself cause a mark or trade dress to acquire secondary meaning." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).

rectangular emblem describing the product's hydration benefits.[45] The Court finds that Plaintiffs'
trade dress was capable of creating a commercial impression distinct from other similar products
on the market,[46] and that Plaintiffs' trade dress was sufficiently stylized (beyond, for example, a
common geometric shape such as a red heart) to indicate distinctiveness from mere common
ornamentation.[47] The Court finds that Plaintiffs have demonstrated a prima facie case of
substantial likelihood of success on the merits with respect to showing that their trade dress
qualifies for protection.

### ii.  Defendants Likely Infringe Plaintiffs' Trade Dress

> To determine whether a use can result in consumer confusion, the Fifth Circuit
> considers the a long list of non-exclusive, non-dispositive factors known as the
> digits of confusion. These factors include (1) the type of trademark allegedly
> infringed, (2) the similarity between the two marks, (3) the similarity of the
> products or services, (4) the identity of the retail outlets and purchasers, (5) the
> identity of the advertising media used, (6) the defendant's intent, and (7) any
> evidence of actual confusion. These digits of confusion do not apply mechanically
> to every case and can serve only as guides, not as an exact calculus. A court
> should consider the application of each digit in light of the specific circumstances
> of the case, and different factors will weigh more heavily from case to case
> depending on the particular facts and circumstances involved.[48]

"The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of
likelihood of confusion need not be supported even by a majority of the ... factors."[49] Importantly
for present purposes, "when a 'mark was adopted with the intent of deriving benefit from the
reputation of [the mark holder] that fact alone may be sufficient to justify the inference that there

---

[45] See Chevron Chem. Co. v. Voluntary Purchasing Grps., 659 F.2d 695, 702–03 (5th Cir. 1981) ("[T]he number of
nonfunctional words and symbols available for use by later comers in the marketing of their products is unlimited.
Similarly, the possible varieties of advertising display and packaging are virtually endless.").

[46] See Dkt. No. 2-2 at 7, ¶ 24 ("The distinctive, non-infringing package designs that PepsiCo created for Gatorade
demonstrates to me that PepsiCo knows how to design products and trade dress in this category that can create a
unique impression. There is simply no legitimate reason that they had to appropriate the distinctive look created for
Electrolit.").

[47] See Amazing Spaces, Inc. v. Metro Mini Storage, 608 F.3d 225, 245 (5th Cir. 2010).

[48] Dall. Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc., 616 F. Supp. 2d 622, 636–37 (N.D. Tex. 2009).

[49] Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 329 (5th Cir. 2008) (quotation omitted).

is confusing similarity.'"[50] The Fifth Circuit has "found an intent to confuse when the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity" or used its product to trade on the plaintiff's popularity.[51]

Defendants' own evidence strongly indicates a likelihood of confusion. Primarily, Defendants admit that the following image is from their own internal documents concerning the launch of Defendants' GATORLYTE product[52]:



Defendants' acknowledgement that GATORLYTE should replace ELECTROLIT or at least be sold right next to it indicates the similarity of marks, the similarity of products, a similar identity of retail outlets who sell the products, and Defendants' actual intent to directly challenge ELECTROLIT. Defendants intentionally targeted the "Hispanic population,"[53] and Plaintiffs'

---

[50] *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 482 (5th Cir. 2008) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)).
[51] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 456 (5th Cir. 2017).
[52] Dkt. No. 27-3 at 4, ¶ 12 (citing Dkt. No. 27-4 at 2).
[53] Dkt. No. 27-5 at 2, ¶ 6.

product originated in Mexico[54] and Plaintiffs also target the Hispanic population.[55] Defendants advertise their product "primarily to and through convenience stores, drug stores and other outlets."[56] Plaintiffs similarly market their product to grocery stores and convenience stores.[57] Defendants only argue that the document in which the image above is located was not final, or was only "high-level guidance."[58] The Court is unpersuaded. Because Defendants' intent is the predominant factor,[59] and the parties do not dispute that Defendants intended to replace Plaintiffs' ELECTROLIT product in the same rehydration beverage marketplace, at similar retailers, targeted at the same consumer population, the Court does not need more to find a prima facie case of a likelihood of confusion among consumers. The Court holds that Plaintiffs have shown a substantial likelihood of success on the merits sufficient for a temporary restraining order.

### 3.   Substantial Threat of Immediate and Irreparable Harm

Defendants argue Plaintiffs cannot show a substantial threat of immediate and irreparable harm because the ELECTROLIT and GATORLYTE products are distinct from each other and unlikely to cause customer confusion.[60] The Court is unpersuaded for the reasons elaborated in Section II.2, *supra*. In the case Defendants cite in support of their position that Plaintiffs cannot show irreparable harm, the District of Minnesota held that, in light of the Supreme Court's 2006 decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), plaintiffs are not entitled to a presumption that a likelihood of success on the merits *also* indicates a likelihood of irreparable

---

[54] Dkt. No. 1 at 1, ¶ 2.
[55] Dkt. No. 9 at 53.
[56] Dkt. No. 27-5 at 10, ¶ 30.
[57] Dkt. No. 1 at 9–10, ¶ 33.
[58] Dkt. No. 27 at 48–49, ¶¶ 123–126.
[59] *See Sunbeam Prod., Inc. v. W. Bend Co.*, 123 F.3d 246, 258 (5th Cir. 1997), *overruled in part on other grounds*, *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).
[60] Dkt. No. 27 at 50, ¶ 130.

harm in the preliminary injunction context.[61] In a post-*eBay* decision, however, the Fifth Circuit held that it has "no need to decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case" when the "facts of [the] case support a finding of a substantial threat of irreparable injury."[62]

Defendants also argue that they submitted an application to register GATORLYTE in mid-2020 and have been pitching the product for months, so Plaintiffs should not be entitled to an intervening injunction.[63] However, Defendants application to register GATORLYTE only concerned the word; "that application had no pictures of the Gatorlyte bottle or label,"[64] which is the focus of the current dispute.

"In a trademark infringement case, 'a substantial likelihood of confusion constitutes irreparable injury.'"[65] "When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods. The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill."[66] Here, Plaintiffs have shown a substantial threat of immediate and irreparable harm in the loss of control over their trade dress. Because Plaintiffs "cannot control [Defendants'] use of its trade dress, it is powerless to control its reputation and

---

[61] *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 881 (D. Minn. 2007).

[62] *Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

[63] Dkt. No. 27 at 50, ¶¶ 131–33.

[64] Dkt. No. 30 at 8, ¶ 17; *see* U.S. Trademark Application Serial No. 88,857,239 (filed Apr. 2, 2020).

[65] *Ramada Franchise Sys. v. Jacobcart, Inc.*, No. CIVA 3:01CV0306D, 2001 WL 540213, at *3 (N.D. Tex. May 17, 2001) (quoting *KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D.Ky. 1989)).

[66] *Joy Mfg. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387, 1394 (S.D. Tex. 1989) (Hoyt, J.) (citing *Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982) ("Because plaintiff may not control the quality of defendant's goods, ARI has lost and faces future losses of its own reputation and goodwill. This loss of control, in spite of defendant's claim that its rice quality equals plaintiff's, constitutes immediate, irreparable harm."), *aff'd*, 701 F.2d 408, 412 (5th Cir. 1983) (citation omitted) ("The district judge's decision is well-researched, carefully reasoned, and correctly sets forth the applicable law. We adopt the opinion as our own and affirm the judgment as to each issue considered in the decision.").

place in the market without an injunction."[67] Because Plaintiffs have shown a prima facie case of

a likelihood of confusion between ELECTROLIT and Defendants' GATORLYTE, Plaintiffs'

loss of control over its intellectual property, customer reputation, and goodwill is sufficient to

support entry of a temporary injunction.

### 4.   Greater Injury will Result from Denying the Temporary Restraining Order than from its Being Granted

In determining whether to grant a temporary restraining order, any harm to Plaintiffs if

the order is not granted must be balanced against potential hardships suffered by Defendants if

the temporary injunctive relief is granted.[68] However, "[w]here the only hardship that the

defendant will suffer is lost profits from an activity which has been shown likely to be infringing,

such an argument in defense 'merits little equitable consideration.'"[69] To conclude otherwise

would allow parties to overcome any potential injunction merely based on the size of their

investment in the infringing activity. Furthermore, in considering the potential hardships to a

defendant, the Court looks to the scope of the requested injunction[70] and the *status quo ante litem*

of the parties.[71]

---

[67] *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, No. 4:19-cv-67, 2019 U.S. Dist. LEXIS 61515, at *23 (E.D. Tex. Apr. 10, 2019) (citing *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 696 (N.D. Tex. 2015)).

[68] *See Vogt v. Tex. Instruments Inc.*, No. CIVA 3:05CV2244 L, 2006 WL 4660133, at *2 n.4 (N.D. Tex. Aug. 8, 2006) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) & *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)); *accord Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

[69] *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (quoting *Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977)), *quoted in Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.12 (5th Cir. 1991).

[70] *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (citing *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"); *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996) (a mandatory injunction "orders a responsible party to 'take action.'")); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1980) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976)) ("[a mandatory injunction] goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.")).

[71] *Marlyn*, 571 F.3d at 879 (defining *status quo ante litem* as "the last, uncontested status which preceded the pending controversy").

Here, the analysis of the status quo is complicated by events since this case was initiated on February 18, 2021. Plaintiffs initially sought to enjoin Defendants' GATORLYTE product launch set for February 21, 2021.[72] The Court granted a temporary restraining order on February 19th,[73] but the Fifth Circuit ordered mandamus relief and directed the Court to stay its Temporary Restraining Order on February 21st[74] and this Court did so the following day.[75] Subsequently, "PepsiCo . . . introduced GATORLYTE to the marketplace via an enormous product launch at over 136,000 locations across the country. GATORLYTE is currently on shelves across the country and in the hands of distributors and even consumers."[76] To justify a recall of the product already rolled out nationwide, the Court must consider three factors:

> (1) the willful or intentional infringement by the defendant; (2) whether the risk of confusion to the public and injury to the trademark owner is greater than the burden of the recall to the defendant; and (3) substantial risk of danger to the public due to the defendant's infringing activity.[77]

"Recall is an 'extreme remedy.'"[78] Plaintiffs do not challenge Defendants' argument that ordering a product recall is not warranted.[79] The Court therefore does not find sufficient indicia of willful infringement, confusion to the public that outweighs the onerousness of a recall, or a sufficient risk of danger to the public to justify a full recall of GATORLYTE at this time. Accordingly, though the *status quo ante litem* commenced when Plaintiff initiated this suit before the rollout of GATORLYTE, the Court now considers only a prohibitory injunction

---

[72] Dkt. No. 2.

[73] Dkt. No. 16.

[74] Dkt. No. 21.

[75] Dkt. No. 22.

[76] Dkt. No. 27 at 51, ¶ 135 (citing Dkt. No. 27-2 at 6, ¶ 18).

[77] *Marlyn*, 571 F.3d at 879 (citing *Gucci Am., Inc. v. Daffy's, Inc.,* 354 F.3d 228, 233 (3d Cir. 2003)).

[78] *Ill. Tool Works Inc. v. J-B Weld Co., LLC*, No. 3:19-CV-01434 (JAM), 2019 WL 7816510, at *2 (D. Conn. Dec. 20, 2019) (quoting *Conopco Inc. v. 3DO Co.*, 1999 WL 1277957, at *3 (S.D.N.Y. 1999)).

[79] *Compare* Dkt. No. 30, *with* Dkt. No. 27 at 51, ¶ 136.

(rather than a disfavored mandatory injunction[80]) from the date of the parties' February 26th hearing.

The Court now turns to the balance of the parties' hardships. Defendants argue that the potential harm to Plaintiffs is outweighed by the losses Defendants will suffer if Defendants are forced to halt the rollout of GATORLYTE.[81] In support of this contention, Defendants argue that they produced 3.6 million bottles of GATORLYTE and shipped at least $1.7 million dollars-worth of the product.[82] Defendants also argue that they spent at least $1.3 million in media purchases related to the product and that they risk losing "approximately $3.3 million in aging products depending on the duration of the duration of the injunction," in addition to reputational damage and harm to their distribution network and customers.[83] Defendants further alleged during the February 26th hearing that they spent $18 million on product development, and expect to lose substantial sales based on the sales numbers in the product's first week on the market. While the Court agrees that Defendants' investments are significant, the Court does not find that a temporary prohibitive restraining order will greatly affect these investments. Defendants are not, at least for present purposes, facing the loss of their entire product line or an expensive recall. Plaintiffs' complaint arises over the packaging trade dress, not the name or formula of the product, as Plaintiffs explained at the February 26th hearing. Furthermore, because Defendants decided to proceed with the rollout despite the initial issuance of a Temporary Restraining Order and the pending hearing on another Temporary Restraining Order, and given the size, reputation, and Defendants' vast product lines, the Court is unconvinced by Defendants' arguments that it

---

[80] *See supra* note 70.
[81] Dkt. No. 27 at 51, ¶ 134.
[82] *Id.* at 52, ¶ 138; Dkt. No. 18-1 at 5, ¶ 17.
[83] Dkt. No. 27 at 52–53, ¶ 138 (citing Dkt. No. 18-1 at 6, ¶ 21).

will suffer serious reputational harm and harm to its relationships if prohibited from further rolling out GATORLYTE during the prohibitive period of a Temporary Restraining Order.

The Court credits Plaintiffs' argument that "PepsiCo knew of Plaintiffs' prior rights in the ELECTROLIT trade dress . . . and accepted the risk that their product could be found infringing, and enjoined, through litigation."[84] As Plaintiffs' evidence shows, GATORLYTE is intended to be sold "Next To or In Place of Electrolit Where Sold"[85] and GATORLYTE is a similarly designed direct competitor to ELECTROLIT. "If a party is enjoined from using a trademark, it is inevitable that it will suffer some hardships. [But], the Court notes that the harm which [defendants] allege is at least partially self-inflicted."[86] Furthermore, Plaintiffs attest that "[i]f not enjoined, Defendants' conduct will eviscerate the good will [Plaintiffs] have spent seven years carefully cultivating for the Electrolit brand."[87] The Court holds that granting a temporary restraining order to preserve the status quo and prevent further customer and retailer confusion pending a hearing on Plaintiffs' motion for a preliminary injunction is warranted because "[n]o later action by this Court could retrieve consumers' good will towards the ELECTROLIT brand, once it has been lost."[88]

### 5. *Granting a Temporary Restraining Order will not Disserve the Public Interest*

"[T]he public has an interest in preventing confusion about the origin of the products that it buys. The public interest weighs in favor of granting the preliminary injunction."[89] Defendants argue that the public interest in an open and fair competition in the marketplace weighs against granting a temporary restraining order.[90] However, it is precisely the public interest in *fair*

---

[84] Dkt. No. 9 at 56.
[85] *See supra* note 52.
[86] *Petro Franchise Sys. v. All Am. Props., Inc.*, 607 F. Supp. 2d 781, 797 (W.D. Tex. 2009) (cleaned up).
[87] Dkt. No. 2-2 at 12, ¶ 46.
[88] Dkt. No. 2-1 at 56.
[89] *Lakedreams v. Taylor*, 932 F.2d 1103, 1110 (5th Cir. 1991).
[90] Dkt. No. 27 at 54, ¶ 144.

*competition* in the marketplace that supports granting a temporary restraining order in this case. In light of the Court's finding that Plaintiffs have shown a substantial likelihood of success in showing substantial confusion regarding the products at issue, the Court holds that issuance of a temporary restraining order would not disserve the public interest.

### III. CONCLUSION AND ORDER

Having considered the evidence and the arguments of the parties at the Court's February 26, 2021 hearing,[91] for the foregoing reasons, the Court **GRANTS** Plaintiffs' emergency motion for a temporary restraining order.[92] The Court **ORDERS** that Defendants and their principals, agents, officers, directors, members, servants, employees, successors, assigns, attorneys, and all other persons in concert and participation with them, upon actual notice of this Temporary Restraining Order or by service by any means reasonably calculated to give notice,[93] are immediately **TEMPORARILY RESTRAINED** from the following:

1. Manufacturing, distributing, shipping, advertising, marketing, promoting, selling, or otherwise offering for sale GATORLYTE as depicted in the following trade dress, or any products infringing on the ELECTROLIT trade dress as depicted in the following trade dress or any ELECTROLIT trademarks as registered under trademark registration numbers 4222726 (issued October 9, 2012), 4833885 (issued October 13, 2015), 4717350 (issued April 7, 2015), or 4717232 (issued April 7, 2015).

---

[91] *See* Minute Entry (Feb. 26, 2021).
[92] Dkt. No. 2.
[93] *See* FED. R. CIV. P. 65(d)(2).

 

2.   Representing, by any means whatsoever, that any products manufactured, distributed, advertised, offered, or sold by Defendants are Plaintiffs' products or vice versa (including by mixing GATORLYTE products in ELECTROLIT branded display boxes, coolers, racks or other merchandising equipment or by mixing the products together on the same shelves, or by back-filling GATORLYTE products behind ELECTROLIT on shelves within the space reserved for Plaintiffs' products), and from otherwise acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin or sponsorship of such products.

3.   Infringing any of the ELECTROLIT trademarks or ELECTROLIT trade dress.

4.   Engaging in anticompetitive conduct, including but not limited to, conditioning the sale of Gatorade products on the sale of GATORLYTE, or requiring that distributors or resellers remove ELECTROLIT products from circulation as a condition of purchasing Gatorade or GATORLYTE.

5.   Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in this Temporary Restraining Order.

The Court **ORDERS** Defendants to file a notice with the Court, in writing and under oath, no later than **ten business days** after receipt of this Temporary Restraining Order setting forth in detail the manner and form in which Defendants have complied with the requirements of this Temporary Restraining Order.

The Court **ORDERS** Plaintiffs to **immediately** post bond in the amount of $150,000 by deposit in the registry of the Court as security for the payment of such costs and damages as may be incurred or suffered by any party as a result of any undue harm caused by this Temporary Restraining Order.[94] Failure to post the required bond no later than **March 3, 2021** will result in dissolution of this Temporary Restraining Order

This Temporary Restraining Order is issued at 6:30 p.m. on February 27, 2021, and expires on March 13, 2021, or upon further order of the Court.[95] The Court **ORDERS** the parties to appear for a hearing on Plaintiffs' motion for a preliminary injunction[96] on **March 12, 2021, at 10:30 a.m.** In light of the COVID-19 pandemic, the Court **ORDERS** that the March 12th hearing shall be conducted using the Zoom for Government videoconference application (www.zoomgov.com). Courtroom business attire will be required of all attorneys during the conference. Laptops with a camera feature, cell phones, and electronic tablets may be used as

---

[94] *See* FED. R. CIV. P. 65(c).
[95] FED. R. CIV. P. 65(b)(2).
[96] Dkt. No. 2.

long as the ZoomGov application is functional on the device. The Court will communicate details regarding the methods of participation in the videoconference to the parties by separate e-mail on the business day before the conference. All interested parties intending to appear at the videoconference should have current contact information on file with the Clerk of the Court.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 27th day of February 2021.

_____
Micaela Alvarez
United States District Judge